1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ESTATE OF CHRISTOPHER TEMPLE,              No.  2:23-cv-01713-DAD-CKD
     et al.,
12
                           Plaintiffs,
13                                              ORDER GRANTING IN PART AND
           v.                                   DENYING IN PART DEFENDANTS'
14                                              MOTION TO DISMISS
     PLACER COUNTY SHERIFF'S OFFICE,
15   et al.,                                    (Doc. No. 14)

16                         Defendants.

17

18          This matter is before the court on defendants' motion to dismiss filed on December 1,

19   2023.  (Doc. No. 14.)  On December 18, 2023, defendants' motion was taken under submission

20   on the papers pursuant to Local Rule 230(g).  (Doc. No. 17.)  For the reasons explained below,

21   defendants' motion to dismiss will be granted in part and denied in part.

22                                    **BACKGROUND**

23          This action arises from the death of Christopher Temple (the "decedent") on or about

24   January 11, 2023.  On August 14, 2023, the estate of the decedent (the "estate") and Amber Smith

25   (collectively, "plaintiffs") filed this suit.  (Doc. No. 1.)  On November 17, 2023, plaintiffs filed

26   their first amended complaint ("FAC"), asserting claims against defendants County of Placer and

27   Placer County Sheriff's Office (collectively, the "municipal defendants"), as well as defendants

28   /////

                                            1

1  Sheriff Wayne Woo, Deputy Melissa Adams, Deputy Claudell Vaughan, and Deputy Cody

2  Michael in their individual capacities.  (Doc. No. 12 at ¶¶ 9–14.)

3      In their FAC, plaintiffs allege as follows.  On January 10, 2023, around 11:50 p.m., the

4  decedent was driving a vehicle in Auburn, California.  (*Id.* at ¶ 22.)  The decedent's vehicle was

5  pulled over by defendant Deputy Vaughan due to expired vehicle registration.  (*Id.* at ¶¶ 23, 24.)

6  Defendant Deputies Michael and Adams then arrived at the scene.  (*Id.* at ¶ 26.)  Defendant

7  Vaughan spoke to the decedent through the passenger door of the pulled-over vehicle and then

8  returned to his patrol vehicle to run a records search of the decedent.  (*Id.* at ¶¶ 28, 29.)

9      Defendant Adams approached the driver-side door of the pulled-over vehicle, where the

10  decedent sat in the driver's seat.  (*Id.* at ¶ 30.)  She observed that the decedent's behavior was odd

11  and suspected that he might have mental health issues.  (*Id.* at ¶ 31.)  She asked the decedent if he

12  was on parole, and the decedent responded that he was on probation.  (*Id.* at ¶¶ 32, 33.)

13  Defendant Deputy Adams concluded that the decedent was a known criminal with a disregard for

14  the law and she wanted more control of the situation.  (*Id.* at ¶ 34.)  She then reached into the

15  decedent's vehicle through the opened window and grabbed hold of the decedent's arms or hands,

16  without warning or explanation.  (*Id.* at ¶ 35.)  This confused and frightened the decedent, causing

17  him to reflexively pull away from defendant Adams's grasp.  (*Id.* at ¶¶ 36, 37.)  Defendant

18  Adams ordered the decedent to give her his hands, to which the decedent asked why and told her

19  not to touch him.  (*Id.* at ¶¶ 38, 39.)  Defendant Adams struggled with the decedent through the

20  opened window.  (*Id.* at ¶ 40.)

21      As defendant Adams struggled with the decedent, defendants Michael and Vaughan

22  approached the pulled-over vehicle.  (*Id.* at ¶ 42.)  Defendant Adams then called out a warning,

23  "Gun! Gun! Gun!," falsely signaling to defendants Michael and Vaughan that a gun was present

24  where there was none.  (*Id.* at ¶ 43.)

25      Defendants Michael, Adams, and Vaughan (collectively, the "defendant deputies") backed

26  away from the pulled-over vehicle, unholstered and drew their firearms which they pointed at the

27  decedent.  (*Id.* at ¶¶ 44, 45.)  The decedent exited the vehicle holding a two and one-half-inch

28  /////

2

blade pocketknife in his right hand.  (*Id.* at ¶ 47.)  He then walked approximately 30 feet in front of his pulled-over vehicle and away from the defendant deputies.  (*Id.* at ¶ 48.)

Defendant Adams ordered the decedent to drop the knife.  (*Id.* at ¶ 49.)  The decedent stopped walking away from the officers, turned to face them, and yelled for them to shoot him.  (*Id.* at ¶¶ 50, 52.)  Plaintiffs allege that the defendant deputies knew, or should have known, that the decedent was suffering from a mental disability or mental health crisis.  (*Id.* at ¶ 53.)

After an approximately 25-second stand-off, the decedent took a few steps towards the defendant deputies, who backed up slightly, and then he took two large steps towards them.  (*Id.* at ¶¶ 59, 60, 61.)  Defendants Adams and Vaughan fired several gunshots at the decedent, striking him.  (*Id.* at ¶ 62.)  The decedent fell to the ground in front of the pulled-over vehicle, and he dropped the pocketknife.  (*Id.* at ¶¶ 63, 64.)  According to plaintiffs, the defendant deputies had less-lethal options available but failed to use them.  (*Id.* at ¶ 54.)

The decedent was injured and bleeding from the gunshots.  (*Id.* at ¶ 65.)  The defendant deputies continued to point their firearms at the decedent as he lay on the ground.  (*Id.* at ¶ 66.)  They then approached him with firearms pointed at him for approximately 25 seconds.  (*Id.* at ¶¶ 67, 69.)  Defendants Michael and Vaughan verbally noted the pocketknife on the ground but did not move it, despite the opportunity to do so.  (*Id.* at ¶¶ 70, 71.)

The defendant deputies backed up from where the decedent was lying on the ground.  (*Id.* at ¶ 72.)  The decedent picked himself up from the ground and grabbed the small pocketknife while doing so.  (*Id.* at ¶ 74.)  The decedent was visibly limping and took one step towards the defendant deputies.  (*Id.* at ¶ 76.)  Defendants Michael and Adams then shot the decedent, striking him with several more gunshots.  (*Id.* at ¶ 78.)  Defendant Vaughan did not shoot the decedent a second time.  (*Id.* at ¶ 79.)  The decedent fell to the ground next to the pulled-over vehicle and dropped the pocketknife.  (*Id.* at ¶¶ 81, 82.)  He sustained approximately seven gunshot wounds in total.  (*Id.* at ¶ 83.)

The defendant deputies left the decedent on the ground for approximately 50 seconds after he was shot the second time.  (*Id.* at ¶ 84.)  Defendant Vaughan told the dispatcher, "Don't send in medical yet."  (*Id.* at ¶ 85.)  Defendants Adams and Vaughan applied handcuffs to the

decedent's arms, securing them behind his back, despite it being obvious that handcuffs were unnecessary and would impede access to immediate medical attention.  (*Id.* at ¶¶ 86, 87.)  While defendant Adams and Vaughan applied handcuffs, defendant Michael stood over the decedent, pointing a firearm at the decedent's head.  (*Id.* at ¶ 88.)  Defendant Adams began applying CPR techniques to the decedent approximately 2 minutes and 30 seconds after the decedent had fallen to the ground following the second volley of gunshots.   (*Id.* at ¶ 90.)

The decedent died at the scene.  (*Id.* at ¶ 93.)  The decedent's cause of death was identified as gunshot wounds to the chest and lower torso.  (*Id.* at ¶ 94.)

On May 31, 2023, Lieutenant Matthew Hardcastle made findings in Administrative Investigation FN2023-0002, which concluded that the defendant deputies were justified, lawful, and proper in their actions with respect to the January 11, 2023 incident.  (*Id.* at ¶ 97(a)–(d).)  The findings further concluded that the defendant deputies complied with the Placer County Sheriff's Office's policies regarding the discharge of firearms, rendering medical aid, personal conduct, and use of physical force.  (*Id.*)  Captain Brian Silva concurred with these findings, recommending that the defendant deputies be exonerated and that the investigation be closed. (*Id.* at ¶ 98.)

In their FAC, plaintiffs assert a total of thirteen claims:  (1) a 42 U.S.C. § 1983 claim for excessive use of force in violation of the Fourth Amendment asserted by the estate against all defendants;  (2) a § 1983 claim for "unreasonable medical care" in violation of the Fourth Amendment asserted by the estate against all defendants; (3) a claim under 29 U.S.C. §§ 701, *et seq.* for a violation of § 504 of the Rehabilitation Act asserted by the estate against the municipal defendants; (4) a claim under 42 U.S.C. §§ 12101, *et seq.* for a violation of Title II of the Americans with Disabilities Act ("ADA") asserted by the estate against the municipal defendants; (5) a § 1983 claim for interference with familial association in violation of the Fourteenth Amendment asserted by plaintiff Smith against all defendants; (6) a § 1983 claim for interference with familial association in violation of the First Amendment asserted by plaintiff Smith against all defendants; (7) a claim under Article I, § 13 of the California Constitution for excessive use of force asserted by the estate against all defendants; (8) a claim under Article I, § 13 of the

California Constitution for unreasonable medical care asserted by the estate against all defendants; (9) a claim under California Civil Code § 52.1 (the "Bane Act") asserted by both plaintiffs against all defendants; (10) an assault and battery claim asserted by the estate against all defendants; (11) an intentional infliction of emotional distress claim asserted by the estate against all defendants; (12) a negligence claim asserted by the estate against all defendants; and (13) a wrongful death claim under § 377.60 of the California Code of Civil Procedure asserted by plaintiff Smith against all defendants.  (Doc. No. 12.)

On December 1, 2023, defendants filed the pending motion to dismiss certain claims asserted in plaintiffs' FAC.  (Doc. No. 14.)  On December 12, 2023, plaintiffs filed their opposition to the pending motion to dismiss, and on December 22, 2023, defendants filed their reply thereto.  (Doc. Nos. 16, 20.)

## LEGAL STANDARD

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of the complaint.  *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  A plaintiff is required to allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In determining whether a complaint states a claim on which relief may be granted, the court accepts as true the allegations in the complaint and construes the allegations in the light most favorable to the plaintiff.  *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).  However, the court need not assume the truth of legal conclusions cast in the form of factual allegations. *U.S. ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986).  While Rule 8(a) does not require detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678.  A pleading is insufficient if it offers

mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Moreover, it is inappropriate to assume that the plaintiff "can prove facts that it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

Leave to amend should be granted "freely" when justice so requires. Fed. R. Civ. P. 15(a). The Ninth Circuit maintains a policy of "extreme liberality generally in favoring amendments to pleadings." *Rosenberg Bros. & Co. v. Arnold*, 283 F.2d 406, 406 (9th Cir. 1960). "Dismissal without leave to amend is proper if it is clear that the complaint could not be saved by amendment." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1051 (9th Cir. 2008). To the extent that the pleadings can be cured by the allegation of additional facts, courts will generally grant leave to amend. *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).

## ANALYSIS

### A.  *Monell* Claims

Defendants first seek the dismissal of plaintiffs' § 1983 claims brought against the municipal defendants based on alleged municipal liability under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). (Doc. No. 14-1 at 14–18.)

It is well-established that "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691; *see also Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997). To state a *Monell* claim against a municipality, a plaintiff must allege facts demonstrating "that an 'official policy, custom, or pattern' on the part of [the municipality] was 'the actionable cause of the claimed injury.'" *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (quoting *Harper v. City of Los Angeles*, 533 F.3d 1010, 1022 (9th Cir. 2008)); *see also Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1247 (9th Cir. 2016) (explaining that in order

/////

6

to establish municipal liability under § 1983, a plaintiff must show a direct causal link between the municipal policy or custom and the alleged constitutional violation).

The Ninth Circuit has recognized four theories for establishing municipal liability under *Monell*: "(1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019). "Cases often refer to the fourth theory as 'ratification' by a final policymaker." *Thurston v. City of Vallejo*, No. 2:19-cv-01902-KJM-CKD, 2021 WL 1839717, at *3 (E.D. Cal. May 7, 2021). Although unclear, plaintiffs appear to proceed here under the second, third, and fourth theories.[1] For the reasons discussed below, the court finds that plaintiffs' *Monell* claims are insufficiently alleged under those theories.

### 1.   Practice and Custom

To establish liability under the pervasive practice and custom theory, a plaintiff must allege and show a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992)). "The custom must be so 'persistent and widespread' that it constitutes a 'permanent and well settled city policy.'" *Id.* (quoting *Monell*, 436 U.S. at 691). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id.*

The court acknowledges that "[t]he line between 'isolated or sporadic incidents' and 'persistent and widespread conduct' is not clearly delineated." *Warkentine v. Soria*, No. 1:13-cv-01550-LJO-MJS, 2014 WL 2093656, at *6 (E.D. Cal. May 19, 2014); *see also Gonzalez v. Cnty. of Merced*, 289 F. Supp. 3d 1094, 1099 (E.D. Cal. 2017) ("It is difficult to discern from the caselaw the quantum of allegations needed to survive a motion to dismiss a pattern and practice claim."). As previously observed by another judge of this district, "[p]erhaps the most that can be said is that one or two incidents ordinarily cannot establish a policy or custom, while more

---

[1] Plaintiffs do not appear to proceed under the first theory as they do not allege that a constitutional violation was carried out in accordance with a formal policy.

1    incidents may permit the inference of a policy, taking into account their similarity, their timing,

2    and subsequent actions by the municipality." *J.M. ex rel. Rodriguez v. Cnty. of Stanislaus*, No.

3    1:18-cv-01034-LJO-SAB, 2018 WL 5879725, at *5 (E.D. Cal. Nov. 7, 2018).

4           Here, the FAC contains no factual allegations that, if proven, would show a pattern of

5    other similar incidents.  Plaintiffs merely allege that the municipal defendants and defendant Woo

6    "knew or should have known that a substantial number of contacts had occurred between their

7    personnel and persons wherein force had been applied involved mentally ill and/or substance-

8    impaired persons who do not respond in the way persons who are not mentally ill do to orders,

9    commands, brisk and direct language, and escalating force" because Placer County "regularly

10   received calls for assistance with persons undergoing mental health crises and, as a result, officers

11   under their command are on the front lines in dealing with persons with mental health problems,

12   including [the decedent]."  (Doc. No. 12 at ¶ 102.)  These allegations lack specificity regarding

13   the nature of these "calls for assistance" and the defendants' responses to them and are therefore

14   insufficient to give rise to a plausible inference that there is a permanent and well-settled policy.

15   *See Brown v. Cnty. of San Bernardino*, No. 20-cv-01304-JGB-SHK, 2021 WL 99722, at *5 (C.D.

16   Cal. Jan. 8, 2021) (dismissing a custom, policy, and practice claim where the plaintiff failed "to

17   explain what happened, when, who was involved, any similarities to the facts here, or the

18   Defendants' subsequent actions"); *Rodriguez v. Cnty. of Los Angeles*, No. 2:21-cv-06574-VAP-

19   AFM, 2021 WL 6496745, at *4 (C.D. Cal. Oct. 22, 2021) (same); *J. A. v. Cnty. of San

20   Bernardino*, No. 5:20-cv-02468-VAP-KK, 2021 WL 5046438, at *5 (C.D. Cal. May 20, 2021)

21   (same).

22          Plaintiffs' allegations therefore fail to support a *Monell* claim under the "pervasive

23   practice or custom" theory.

24          2.    Failure to Train

25          Under *Monell*, "the inadequacy of police training may serve as the basis for § 1983

26   liability only where the failure to train amounts to deliberate indifference to the rights of persons

27   with whom the police come into contact."  *Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1158

28   (9th Cir. 2014) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).  The plaintiff "must

8

demonstrate a 'conscious' or 'deliberate' choice on the part of a municipality in order to prevail on a failure to train claim." *Price v. Sery*, 513 F.3d 962, 973 (9th Cir. 2008) (citation omitted). "Under this standard, [the plaintiff] must allege facts to show that the [municipality] 'disregarded the known or obvious consequence that a particular omission in their training program would cause [municipal] employees to violate citizens' constitutional rights.'" *Flores*, 758 F.3d at 1159 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)); *see also Connick*, 563 U.S. at 61 ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."). "[T]he identified deficiency in a [municipality's] training program must be closely related to the ultimate injury." *City of Canton*, 489 U.S. at 391; *see also Riggi v. City of Placerville*, No. 2:11-cv-00753-MCE, 2011 WL 6396439, at *5 (E.D. Cal. Dec. 19, 2011) ("The 'closely related' or 'moving force' requirement is akin to the tort law causation standard of proximate cause.") (citing *Harper*, 533 F.3d at 1026).

Ordinarily, plaintiffs must allege a "pattern of similar constitutional violations by untrained employees" in order to state a claim based upon a failure to train. *Flores*, 758 F.3d at 1159 (quoting *Connick*, 563 U.S. at 62). However, "[a] plaintiff also might succeed in proving a failure-to-train claim without showing a pattern of constitutional violations where 'a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.'" *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006) (quoting *Bd. of Cnty. Comm'rs*, 520 U.S. at 409).

Here, defendants argue that "[p]laintiffs have not alleged any pattern of similar constitutional violations, nor have they provided any other factual allegations suggesting deliberate indifference." (Doc. No. 14-1 at 16.) The court agrees. Plaintiffs fail in their FAC to specifically identify a single prior incident in which Placer County officers committed a constitutional violation similar to those alleged in this case. Although plaintiffs are not required to establish a pattern of constitutional violations, *see Long*, 442 F.3d at 1186, they have failed here to plausibly allege that the incident at issue qualifies as the rare situation in which the alleged "violation of federal rights [was] a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations," *id.* While plaintiffs allege

that the municipal defendants and defendant Woo "were or should have been on notice" regarding

the inadequacy of their policies and training "because the inadequacies constituted life-

threatening decisions and were so obvious and likely to result in the violation of rights of persons

coming into contact with their personnel," (Doc. No. 12 at ¶ 108), which is an allegation of

deliberate indifference, *see City of Canton*, 489 U.S. at 390, this conclusory allegation lacks any

factual support in the FAC.  Plaintiffs never explain in their complaint *why* the alleged

inadequacies were "so obvious."  *See London v. Heh*, No. 22-cv-00491-DKW-KJM, 2024 WL

1331949, at *7 (D. Haw. Mar. 27, 2024) ("[The plaintiff] claims that the violation of his

constitutional rights was 'certainly foreseeable' as a result of the City's 'deliberate choice' to

reject implicit racial bias training based on the assumption that racial discrimination 'may be

more of [a] Mainland issue than a local one.'  Notably, however, [the plaintiff] never explains

why he believes such violations were 'certainly foreseeable.'") (internal citations omitted).

      In their pending motion to dismiss, defendants also argue that there are no "facts

establishing any policy not implemented was a cause of the constitutional violation."  (Doc. No.

14-1 at 16.)  In their opposition, plaintiffs argue that their allegation that defendants' "inadequate

policies, procedures, and training did proximately cause [the] violation of rights of persons

coming into contact with officials, including the officer-involved shooting and death of [the

decedent]" suffices at the pleading stage to meet the causation requirement.  (Doc. No. 16 at 9)

(quoting Doc. No. 12 at ¶ 109).  However, these conclusory allegations are insufficient to allege

the close causal relationship required for a *Monell* claim based upon a failure to train.

      Accordingly, plaintiffs' *Monell* claim predicated on a failure to train theory also fails.

      3.     Ratification[2]

      Where a municipal liability claim is based on a theory of ratification, the plaintiff must

show that an authorized policymaker, acting with "knowledge of [a subordinate's] alleged

---

[2]  In their opposition, plaintiffs argue that defendants failed to move for dismissal of their claim based upon the ratification theory, precluding dismissal of their *Monell* claim.  (Doc. No. 16 at 11.)  The court disagrees.  In moving to dismiss, defendants argue that "plaintiffs' allegations do not establish *Monell* liability," thus appearing to move for dismissal as to all theories of liability advanced as to plaintiffs' *Monell* claims.  (Doc. No. 14-1 at 14.)

constitutional violation," where such knowledge was obtained "before the alleged constitutional violations ceased," nonetheless "approve[d] a subordinate's decision and the basis for it." *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) (citations omitted).

Here, plaintiffs allege that the municipal defendants and defendant Woo "delegated policymaking authority to their subordinates, including Lieutenant Matthew Hardcastle and Captain Brian Silva, related to review of critical incidents and officer-involved shootings." (Doc. No. 12 at ¶ 106.) They allege that "through Lieutenant Matthew Hardcastle and Captain Brian Silva's findings, recommendations, and dispositions of Administrative Investigation FN2023-0002," the municipal defendants and defendant Woo "ratified defendants Cody Michael, Melissa Adams, and Claudell Vaughan's actions and inactions related to Christopher Temple." (*Id.* at ¶ 107.)

However, there are no allegations in plaintiffs' FAC that any "authorized policymakers" knew of and approved of the defendant deputies' actions "before the alleged constitutional violations ceased." *Christie*, 176 F.3d at 1239. Rather, plaintiffs' ratification theory of liability is based on the exoneration of the defendant deputies after their encounter with the decedent. Consequently, a violation of the decedent's constitutional rights was not caused by the purported actions of any policymaker at Placer County or the Placer County Sheriff's Office, as is required by *Monell*. *See Mueller v. Cruz*, No. 13-cv-01274-CJC-JCG, 2015 WL 9455565, at *3 (C.D. Cal. Dec. 23, 2015) (holding that *Monell* liability could not be established based on the plaintiff's allegation that the officer in question was exonerated after the alleged use of excessive force occurred); *Mitchell v. Cnty. of Contra Costa*, 600 F. Supp. 3d 1018, 1033 (N.D. Cal. 2022) (dismissing the plaintiff's *Monell* claim based on a ratification theory because the amended complaint did not allege that any authorized policymakers knew of and approved the officers' actions "before the alleged constitutional violations ceased") (quoting *Christie*, 176 F.3d at 1239). Accordingly, plaintiffs' *Monell* claim based on a ratification theory fails as well.

Having concluded that plaintiffs have failed to state claims for *Monell* liability under any theory, the court will grant the motion to dismiss plaintiffs' § 1983 claims only as asserted against
/////

11

1    the municipal defendants.  Since it is not clear that amendment of these claims would be futile,

2    leave to amend will be granted.  *See Cook*, 911 F.2d at 247.

3    **B.       Section 1983 Claims Against Defendant Woo**

4           Defendants move to dismiss the § 1983 claims asserted against defendant Woo, arguing

5    that plaintiffs do not allege direct personal participation by defendant Woo in the events which

6    allegedly harmed the decedent and that "[p]laintiffs' conclusory allegations fall short of the

7    requirement that supervisory liability 'must be specifically alleged[.]'"  (Doc. No. 14-1 at 19, 20.)

8           The court can find no factual allegations in the operative FAC that, if proven to be true,

9    would demonstrate that defendant Woo took any action with respect to the decedent.  There are

10   no allegations that defendant Woo participated in the shooting, was anywhere in the vicinity of

11   the shooting, or took personal action to delay the rendering of medical care.  The allegations of

12   the FAC appear instead to be premised solely on defendant Woo's role as a supervisor and

13   policymaker.  (*See* Doc. No. 12 at ¶ 99, 100.)

14          "Under Section 1983, supervisory officials are not liable for actions of subordinates on

15   any theory of vicarious liability."  *Hansen v. Black*, 885 F.2d 642, 645–46 (9th Cir. 1989)

16   (citation omitted).  "A supervisor may be liable if there exists either (1) his or her personal

17   involvement in the constitutional deprivation, or (2) a sufficient causal connection between the

18   supervisor's wrongful conduct and the constitutional violation."  *Id.* (citation omitted).

19   Alternatively, supervisory liability can exist "even without overt personal participation in the

20   offensive act if supervisory officials implement a policy so deficient that the policy 'itself is a

21   repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'"  *Id.*

22   at 646 (citation omitted).

23          Plaintiffs' allegations supporting their § 1983 claims brought against defendant Woo are

24   the same as those alleged as to the municipal defendants.  The central allegation in all four of

25   those § 1983 claims is that these defendants "maintained policies or customs of action and

26   inaction resulting in harm to [the decedent]."  (Doc. No. 12 at ¶¶ 113, 119, 138, 145.)  However,

27   plaintiffs provide no factual support in the FAC for their conclusion that such "policies or

28   customs of action and inaction" existed.  They also fail to detail how these alleged "policies or

1    customs of action and inaction" were the moving force behind the alleged constitutional

2    violations.  *See Gregory v. Clark*, No. 1:11-cv-00151-JLT, 2012 WL 6697955, at *4 (E.D. Cal.

3    Dec. 21, 2012) (dismissing supervisory liability claims where the plaintiff offered "no factual

4    support for his conclusion they implemented such a policy" and "fail[ed] to explain how that

5    policy served as the moving force for alleged constitutional violations").  Furthermore, while

6    plaintiffs contend that their claims against defendant Woo are based on failure to train and

7    ratification theories of liability (Doc. No. 16 at 11–12), these theories fail for the same reasons

8    discussed above.

9          Defendants' motion to dismiss plaintiffs' § 1983 claims against defendant Woo will

10   therefore be granted.  However, because the pleading defects described above could be cured by

11   amendment, dismissal in this regard will be with leave to amend.  *See Cook*, 911 F.2d at 247.[3]

12   **C.     Section 1983 Unreasonable Medical Care Claim Against the Remaining Defendants**

13         Defendants next move to dismiss plaintiffs' § 1983 claim for unreasonable medical care

14   against all defendants.   (Doc. No. 14-1 at 20.)  Having dismissed all § 1983 claims brought

15   against the municipal defendants and defendant Woo, the court will only analyze this claim as

16   brought against defendants Michael, Adams, and Vaughan, who plaintiffs allege "prevented [the

17   decedent] from receiving[] reasonable and necessary medical care[] in violation of the Fourth

18   Amendment to the U.S. Constitution."  (Doc. No. 12 at 16–17.)

19         "[S]uspects have a Fourth Amendment right to 'objectively reasonable post-arrest

20   [medical] care' until the end of the seizure."  *Est. of Cornejo ex. rel. Solis v. City of Los Angeles*,

21   /////

22   /////

23   _____

24   [3]  In their reply, defendants contend that plaintiffs' "claims against Sheriff Woo are, as a matter of fact and law, official capacity claims."  (Doc. No. 20 at 6.)  They further argue that "the claims

25   are redundant and duplicative where, as here, the local government entity . . . is also named in the lawsuit and has identical allegations asserted against it."  (*Id.*)  Defendants assert that they

26   previously advanced this argument in their motion to dismiss.  (*Id.*)  However, the court has reviewed the motion to dismiss and has not found this argument raised therein.  Of course, "[t]he

27   district court need not consider arguments raised for the first time in a reply brief."  *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) (citation omitted).  Accordingly, the court declines to

28   consider this argument raised for the first time in defendants' reply.

618 F. App'x 917, 920 (9th Cir. 2015)[4] (citation omitted).  "This means that officers must 'seek the necessary medical attention for a detainee when he or she has been injured while being apprehended by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital.'"  *Id.* (citation omitted).

Here, plaintiffs allege "[the defendant deputies] failed to provide adequate and necessary post-shooting medical care to [the decedent]," and more specifically, that "[the defendant deputies] left [the decedent] on the ground for approximately 50 seconds after he was shot"; "[Vaughan] told the dispatcher 'don't send in medical yet'; "[Adams] and [Vaughan] applied handcuffs to [the decedent]'s arms, securing his arms behind his back" when "[the decedent's] body was limp and it was obvious that handcuffs were not necessary and would impede access to immediate medical attention which he required"; and "[Adams] began applying [CPR] techniques to [the decedent] approximately two minutes and 30 seconds after he had been shot and fell to the ground following the second volley of gunshots."  (Doc. No. 12 at ¶¶ 84, 85, 86, 87, 90, 91.)

In their motion to dismiss, defendants argue that the "deputies did not react immediately" due to "concern[s] about safety and that Temple might attempt[] to get up again."  (Doc. No. 14-1 at 21.)  Furthermore, they argue that "Adams began CPR approximately 90 seconds later" and that "this is sufficient to show the officers acted reasonably."  (Doc. No. 14-1 at 21–22.) However, as plaintiffs point out (Doc. No. 16 at 13), defendants' explanation for why the defendant deputies did not react immediately to render medical assistance, as well as their version of the disputed facts, are not persuasive arguments in support of their motion to dismiss.  *See Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)."); *Kong v. Trader Joe's Co.*, No. 20-56415, 2022 WL 1125667, at *1 (9th Cir. Apr. 15, 2022) ("Defendants' explanation for the more expensive choice is unavailing at the pleading stage.").

/////

---

[4]  Citation to this and other unpublished Ninth Circuit opinions in this order is appropriate pursuant to Ninth Circuit Rule 36-3(b).

Accordingly, the court will deny defendants' motion to dismiss plaintiff's second claim brought against defendants Michael, Adams, and Vaughan.

**D.      Rehabilitation Act and ADA Claims**

Defendants next move to dismiss plaintiffs' third and fourth claims for relief, which assert violations of § 504 of the Rehabilitation Act and Title II of the ADA.  (Doc. No. 14-1 at 22.)

"Title II of the ADA prohibits public entities from discriminating on the basis of disability.  Section 504 [of the Rehabilitation Act] similarly prohibits disability discrimination by recipients of federal funds."  *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 737 (9th Cir. 2021) (citing 42 U.S.C. § 12132; 29 U.S.C. § 794).  "The two laws are interpreted coextensively because 'there is no significant difference in the analysis of rights and obligations created by the two Acts.'"  *Id.* (quoting *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1098 (9th Cir. 2013)).

To state a claim for disability discrimination, "the plaintiff must allege four elements:  (1) the plaintiff is an individual with a disability; (2) the plaintiff is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) the plaintiff was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability."  *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002).

With respect to the first element, the ADA defines "disability" as:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment . . . .

42 U.S.C. § 12102(1).  Mental impairments include "[a]ny mental or psychological disorder" including, among other things, "emotional or mental illness."  28 C.F.R. § 36.105.  Plaintiffs appear to assert that the decedent suffered from a disability as defined in subsection (A), alleging

/////

that the decedent "had a mental impairment that substantially limited one or more major life

activities, at all times material herein."  (Doc. No. 12 at ¶¶ 124, 130).

The ADA advises that "[t]he definition of disability in this chapter shall be construed in

favor of broad coverage of individuals under this chapter, to the maximum extent permitted by

the terms of this chapter."  42 U.S.C. § 12102(4)(A); *see also* 29 C.F.R. § 1630.2(j)(1)(i) ("The

term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the

maximum extent permitted by the terms of the ADA.  'Substantially limits' is not meant to be a

demanding standard.").  Major life activities include, but are not limited to, caring for oneself,

concentrating, thinking, and communicating.  42 U.S.C. § 12102 (2)(A).  Nonetheless, to properly

allege the element of disability, a plaintiff must identify more than the general nature of the

disability.  *See Tennyson v. Cnty. of Sacramento*, No. 2:19-cv-00429-KJM-EFB, 2020 WL

4059568, at *5 (E.D. Cal. July 20, 2020) ("Although plaintiffs identify the general nature of the

disability, more is required to state a claim."); *see also Bresaz v. Cnty. of Santa Clara*, No. 14-cv-

03868-LHK, 2015 WL 1230316, at *6 (N.D. Cal. Mar. 17, 2015) (explaining that where "a

plaintiff alleges that he or she is disabled within the meaning of the ADA, courts have generally

required the plaintiff to plead the disability with some factual specificity").  "[A] successful

plaintiff will usually allege that he or she suffered from a specific, recognized mental or physical

illness."  *Bresaz v. Cnty. of Santa Clara*, 136 F. Supp. 3d 1125, 1135–36 (N.D. Cal. 2015).

Defendants contend plaintiffs have not alleged the decedent's disability with the requisite

factual specificity, (*see* Doc. No. 14-1 at 23), while plaintiffs insist that they have, (*see* Doc. No.

16 at 14).  The allegations regarding the decedent's disability are that:  (1) the decedent "had a

mental impairment that substantially limited one or more major life activities, at all times material

herein," (Doc. No. 12 at ¶¶ 124, 130); (2) he "struggled with mental health and substance abuse

issues during the course of his life, including diagnosed conditions for which he was prescribed

medications," (*id.* at ¶ 17); and (3) his "disabilities substantially limited major life activities,

including, but not limited to, caring for oneself, speaking, concentrating, thinking, and

communicating.  For example, [the decedent's] disabilities caused him to become paranoid, easily

confused, defensive, agitated, stressed, fearful, and anxious" and "made it difficult for him to

16

1  process relayed information and to verbalize his own thoughts, feelings, and intentions," (*id.* at

2  ¶ 19).

3          The court finds plaintiffs' allegations in this regard to be vague.  Nowhere in the FAC do

4  plaintiffs articulate the "mental impairment" that the decedent allegedly suffered from.  As a

5  result, plaintiffs' allegations are insufficient to plausibly suggest that the decedent had a disability

6  as defined under the ADA.  *See Sincerny v. City of Walnut Creek*, No. 17-cv-02616-HSG, 2017

7  WL 4642432, at *1 (N.D. Cal. Oct. 17, 2017) (holding that the plaintiff's allegations of "physical

8  and neurological limitations, including diminished mental capacity," caused by brain surgery

9  complications, were insufficient); *Bresaz*, 2015 WL 1230316, at *6 (finding the plaintiffs'

10  allegation that the decedent had a "mental illness," without more, to be insufficient); *Klamut v.*

11  *California Highway Patrol*, No. 15-cv-02132-MEJ, 2015 WL 9024479, at *7 (N.D. Cal. Dec. 16,

12  2015) ("Plaintiff offers no factual allegations to support his claim that he was disabled, such as

13  the type or nature of mental illness from which he suffers.  Plaintiff's allegation that he has a

14  'mental illness,' without more, is a 'formulaic recitation of the elements of a cause of action'

15  under the ADA and does not satisfy his pleading obligations.") (quoting *Twombly*, 550 U.S. at

16  555).

17          For these reasons, defendants' motion to dismiss plaintiffs' third and fourth claims is

18  granted.  Because these deficiencies could be cured by the allegation of additional facts, the court

19  will grant leave to amend as to this claim as well.  *See Cook*, 911 F.2d at 247.

20  **E.      Article I, § 13 Claims**

21          Next, defendants seek dismissal of plaintiffs' seventh and eighth claims, which allege

22  excessive use of force and unreasonable medical care in violation of Article I, § 13 of the

23  California Constitution.  (Doc. No. 14-1 at 27.)  This provision states:  "The right of the people to

24  be secure in their persons, houses, papers, and effects against unreasonable seizures and searches

25  may not be violated . . . ."  Cal. Const. art. 1, § 13.  Defendants argue that this state constitutional

26  provision does not provide a private cause of action for damages.  (Doc. No. 14-1 at 27.)

27          The determination of whether a provision of the California Constitution provides for a

28  private right of action is outlined in the California Supreme Court's decision in *Katzberg v.*

17

*Regents of the University of California*, 29 Cal. 4th 300 (2002).  The analysis involves a two-step approach.  First, the court examines "whether there is evidence from which [it] may find or infer, within the constitutional provision at issue, an affirmative intent either to authorize or to withhold a damages action to remedy a violation," considering "the language and history of the constitutional provision at issue, including whether it contains guidelines, mechanisms, or procedures implying a monetary remedy, as well as any pertinent common law history." *Katzberg*, 29 Cal. 4th at 317.  If such intent is found, it must be given effect.  *Id.*  Second, "if no affirmative intent either to authorize or to withhold a damages remedy is found, the court shall undertake the 'constitutional tort' analysis adopted by *Bivens*[5] and its progeny."  *Id.*  This analysis turns on "whether an adequate remedy exists, the extent to which a constitutional tort action would change established tort law, and the nature and significance of the constitutional provision," as well as considering "the existence of any special factors counseling hesitation in recognizing a damages action, including deference to legislative judgment, avoidance of adverse policy consequences, considerations of government fiscal policy, practical issues of proof, and the competence of courts to assess particular types of damages."  *Id.*

The California Supreme Court has not determined whether a private cause of action for damages exists under Article I, § 13.  *Julian v. Mission Cmty. Hosp.*, 11 Cal. App. 5th 360, 392 (2017).  Moreover, no California appellate court has decided if a plaintiff can seek damages for violations of this state constitutional provision, nor has the Ninth Circuit.  *Rios v. Cnty. of Sacramento*, 562 F. Supp. 3d 999, 1021 (E.D. Cal. 2021).  Federal district courts in California are

/////

/////

/////

/////

/////

/////

---

[5] *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971).

divided on this issue.[6]  Some have found that the common law history implies an affirmative

intent on the part of the framers of the California Constitution to authorize damages.  *See, e.g.*,

*Brewster v. City of Los Angeles*, 672 F. Supp. 3d 872, 997 (C.D. Cal. 2023); *Fitzpatrick v. City of*

*Los Angeles*, No. 21-cv-06841-JGB-SP, 2022 WL 1421319, at *9 (C.D. Cal. Jan. 20, 2022); *See*

*Garcia v. Cnty. of Riverside*, No. 13-cv-00616-JGB-SP, 2017 WL 11631219, at *5 (C.D. Cal.

Apr. 28, 2017); *OSJ PEP Tennesse LLC v. Harris*, No. 14-cv-03741-DDP-MAN, 2014 WL

4988070, at *7 (C.D. Cal. Oct. 7, 2014); *Smith v. Cnty. of Riverside*, No. 05-cv-00512-VAP-SGL,

2006 WL 8447071, at *7 (C.D. Cal. May 16, 2006).  Others have concluded that no private cause

of action is available, citing a lack of affirmative intent on the part of the framers and the

availability of alternative remedies.  *See, e.g.*, *Est. of F.R. v. Cnty. of Yuba*, No. 2:23-cv-00846-

WBS-CKD, 2023 WL 6130049, at *6–7 (E.D. Cal. Sept. 19, 2023); *Novel v. Los Angeles Cnty.*

*Sheriff's Dep't*, No. 2:19-cv-01922-RGK-AGR, 2019 WL 7940676, at *6 (C.D. Cal. July 23,

2019); *Roy v. Cnty. of Los Angeles*, 114 F. Supp. 3d 1030, 1043 (C.D. Cal. 2015); *Leon v. City Of*

*Merced*, No. 1:14-cv-01129-GEB, 2015 WL 135904, at *4 (E.D. Cal. Jan. 9, 2015); *Brown v.*

*Cnty. of Kern*, No. 1:06-cv-00121-OWW-TAG, 2008 WL 544565, at *17 (E.D. Cal. Feb. 26,

---

[6]  Indeed, this divide has caused many district courts in California to avoid resolving the issue where it has not been adequately briefed by the parties or can be appropriately deferred to a later stage of the litigation.  *See Est. of Chivrell v. City of Arcata*, 694 F. Supp. 3d 1218, 1233 (N.D. Cal. Sept. 26, 2023) (denying a motion to dismiss such a claim because the moving defendants had raised their challenge to it for the first time in their reply brief and had "not fully briefed the issue"); *Lesher v. City of Anderson*, No. 2:21-cv-00386-WBS-DMC, 2021 WL 2682161, at *6 (E.D. Cal. June 30, 2021) ("Given the lack of a *Katzberg* analysis by defendants and the early stage of these proceedings, the court is not inclined to foreclose this cause of action at this time."); *Rios*, 562 F. Supp. 3d at 1024 ("In this situation, the fairest resolution is to deny the County's motion to dismiss without prejudice to reasserting at a later date, such as in a motion for summary judgment or for judgment on the pleadings, that a private action is not available."); *John v. Lake Cnty.*, No. 18-cv-06935-WHA, 2019 WL 859227, at *8 (N.D. Cal. Feb 22, 2019) ("[T]his order does not finally resolve these important issues of California constitutional law.  Resolution of these issues will be made, if need be, on a complete evidentiary record.").  Still another district court has reviewed these authorities in a somewhat different context and declined to exercise supplemental jurisdiction over an Article 1, § 13 claim, determining that for a district court to resolve this issue "without further guidance" from the California courts "would be inappropriate." *Gonzalez v. Cnty. of Los Angeles*, No. 2:22-cv-08525-MCS-AS, 2023 WL 4247196, at *9 (C.D. Cal. Apr. 20, 2023).  Here, the issue has been fairly briefed by the parties and, while the undersigned would welcome guidance from the California Supreme Court, this litigation must move forward.

2008); *Manning v. City of Rohnert Park*, 06-cv-03435-SBA, 2007 WL 1140434, at *1 (N.D. Cal. Apr. 17, 2007).

In the absence of a definitive ruling from the California Supreme Court, this court "must predict how the California Supreme Court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises and restatements as guidance." *Astaire v. Best Film & Video Corp.*, 116 F.3d 1297, 1300 (9th Cir. 1997).  Moreover, "federal courts may look to state supreme court dicta" in making such predictions.  *Cont'l Cas. Co. v. Nationwide Mut. Ins. Co.*, No. 14-cv-07326-GW-PLA, 2014 WL 12607694, at *2 (C.D. Cal. Nov. 3, 2014).

Plaintiffs do not challenge defendants' argument that the "plain text" and "legislative history" of Article I, § 13 do not explicitly authorize a private right of action for damages.  (Doc. No. 16 at 17.)  Instead, they argue that the California Supreme Court's decision in *Katzberg v. Regents of the University of California*, 29 Cal. 4th 300 (2002) provides a framework strongly suggesting that damages are available under the state constitutional provision's common law history.  (Doc. No. 16 at 17.)

The court finds that the decision in *Katzberg* itself is a strong indicator that the California Supreme Court would recognize a private cause of action for damages under Article I, § 13.  In *Katzberg*, the California Supreme Court observed that English common law provided a damages remedy for unlawful searches and seizures.  *See* 29 Cal. 4th at 322 ("The prohibition against unlawful searches and seizures originated in the Magna Carta . . . . The civil cause of action was fully developed in England and provided a damage remedy for the victims of unlawful searches at common law.") (quoting *Brown v. State*, 89 N.Y.2d 172, 188 (1996)).  Furthermore, as recognized by another district court, "the California Supreme Court in *Katzberg* appeared to contrast the lack of common law support for an action for damages under article I, section 7, with the existence of common law history providing a damages remedy for unlawful searches and seizures." *Brewster*, 672 F. Supp. 3d at 997 (citing *Katzberg*, 29 Cal. 4th at 322).

Some courts have criticized this part of *Katzberg*'s holding as being merely dicta.  *See Est. of F.R.*, 2023 WL 6130049, at *6 ("Some courts have recognized a cause of action under § 13

1  based solely on dicta in *Katzberg* . . . . The court does not find this general common law history to

2  be sufficient evidence of 'affirmative intent' to create a private cause of action, and therefore

3  resort to the second step of the *Katzberg* analysis is appropriate."); *Martin v. Cnty. of San Diego*,

4  No. 03-cv-01788-IEG-WMC, 2004 WL 7334370, at *3 (S.D. Cal. May 12, 2004) (dismissing the

5  plaintiff's claim brought under Article I, § 13, noting that "aside from the dicta in *Katzberg*,

6  plaintiff cites no evidence of legislative intent, voter intent, or common law history supporting

7  monetary damages for the alleged violations").  However, given that this court's charge is to

8  predict how the California Supreme Court would decide the issue, the undersigned finds the dicta

9  in *Katzberg* to provide strong support for concluding that the state high court today would likely

10  hold that a private cause of action for damages exists under Article I, § 13.  *See Garcia*, 2017 WL

11  11631219, at *5 (stating that "the discussion in *Katzberg* addressing the rights flowing to a victim

12  of an illegal search and seizure provides a strong predictor as to how the California Supreme

13  Court would decide this issue:  namely, by inferring a right to damages based on the provision's

14  derivation from English common law").

15         Moreover, the court finds the discussion in *Harris* to be persuasive, where the district

16  court noted that shortly after the adoption of its Constitution, California affirmed by statute that

17  "[t]he Common Law of England, so far as it is not repugnant to or inconsistent with the

18  Constitution of the United States, or the Constitution or laws of the State of California, shall be

19  the rule of decision in all the Courts of this State."  2014 WL 4988070, at *7 (quoting Cal. Stats.

20  1850, ch. 95).  This provision supports the inference that the framers of the California

21  Constitution intended to incorporate common law remedies for unlawful searches and seizures.

22         Because the court finds that the common law history of Article I, § 13 supports the finding

23  of an affirmative intent by the framers to authorize the award of damages for violation of that

24  provision, the court need not undertake the second step of the *Katzberg* analysis.  *See Fitzpatrick*,

25  2022 WL 1421319, at *9; *Garcia*, 2017 WL 11631219, at *5.

26         In the alternative, defendants argue that even if Article I, § 13 of the California

27  Constitution does provide a private right of action, defendant Woo is immune from liability

28  pursuant to California Government Code § 820.8.  (Doc. No. 14-1 at 27.)  That statute states that

21

1   "[e]xcept as otherwise provided by statute, a public employee is not liable for an injury caused by

2   the act or omission of another person.  Nothing in this section exonerates a public employee from

3   liability for injury proximately caused by his own negligent or wrongful act or omission."  Cal.

4   Gov't Code § 820.8.  In their opposition, plaintiffs contend that that § 820.8 is inapplicable

5   because their claim against defendant Woo is based on upon his own acts, not the conduct of his

6   subordinates.  (Doc. No. 16 at 22.)

7          The court need not resolve the question of whether defendant Woo is entitled to immunity

8   under § 820.8 with respect to plaintiffs' claims brought under Article I, § 13 of the California

9   Constitution.  This is because, for the reasons discussed below and elsewhere in this order, the

10  court concludes that plaintiffs' FAC lacks sufficient factual allegations to state any cognizable

11  claims against defendant Woo and all such claims will be dismissed with leave to amend.

12         Accordingly, plaintiffs' seventh and eighth claims will be dismissed as to defendant Woo

13  only, with leave to amend.  *See Cook*, 911 F.2d at 247.  Defendants' motion to dismiss plaintiffs'

14  seventh and eighth claims will otherwise be denied.

15  **F.     Bane Act Claim Against Defendant Woo**

16         The Bane Act provides a private cause of action against any person who, "whether or not

17  acting under color of law, interferes by threat, intimidation, or coercion . . . with the exercise or

18  enjoyment by any individual or individuals of rights secured by the Constitution or laws of the

19  United States."  Cal. Civ. Code § 52.1.  "The elements of a Bane Act claim are essentially

20  identical to the elements of a § 1983 claim, with the added requirement that the government

21  official had a 'specific intent to violate' a constitutional right."  *Hughes v. Rodriguez*, 31 F.4th

22  1211, 1224 (9th Cir. 2022).

23         Defendants move to dismiss plaintiffs' Bane Act claim as asserted against defendant Woo.

24  (Doc. No. 14-1 at 30.)  As discussed above, the court has concluded that plaintiffs have failed to

25  adequately allege an underlying constitutional violation against defendant Woo.  Therefore,

26  plaintiffs' Bane Act claim against that defendant will also be dismissed.  *See Martinez v. Diaz*,

27  No. 21-cv-00281-JWH-RAO, 2021 WL 8825219, at *8 (C.D. Cal. Sept. 13, 2021) ("Plaintiff's

28  Bane Act claim against the [certain defendants] fails as Plaintiff has not sufficiently alleged an

1    underlying constitutional violation by these defendants.").  However, the court will grant leave to

2    amend as to this claim because amendment does not appear to be futile.  *See Cook*, 911 F.2d at

3    247.

4    **G.      Negligence Claim Against Defendant Woo**

5              In asserting a negligence claim against defendant Woo, plaintiffs allege that he "had a

6    special relationship" with defendants Michael, Adams, and Vaughan, and "owed [the decedent] a

7    duty of care and breached the duty including, among other actions, by maintaining policies or

8    customs of action and inaction which resulted in harm to [the decedent]."  (Doc. No. 12 at ¶ 190.)

9    The court construes this claim as a negligent supervision claim.

10             A negligent supervision claim may be properly brought against an individual if a special

11   relationship exists between the supervisor and the deceased.  *See Est. of Alejandro Sanchez v.

12   Cnty. of Stanislaus*, No. 1:18-cv-00977-DAD-BAM, 2019 WL 1745868, at *11 (E.D. Cal. Apr.

13   18, 2019).  Here, plaintiffs only allege that defendant Woo had a special relationship with the

14   other defendant deputies, not with the decedent.  In any case, district courts in California,

15   including this one, have declined to find a special relationship under such circumstances.  *See id.*

16   (recognizing that "district courts have declined to find such a relationship under circumstances

17   similar to those presented here" and dismissing the plaintiffs' claim brought against the county

18   sheriff for negligent hiring, retention, training, or supervision because the plaintiffs failed to

19   allege the existence of a special relationship with the decedent); *Osuna*, 392 F. Supp. 3d at 1183

20   (same); *Kendrick v. Cnty. of San Diego*, No. 15-cv-02615-GPC-AGS, 2018 WL 1316618, at *11

21   (S.D. Cal. Mar. 14, 2018) ("Here, Plaintiff does not allege a special relationship existed between

22   [the decedent] and Sheriff Gore.  Therefore, Sheriff Gore cannot be personally liable for a claim

23   of negligent hiring and supervision . . . ."), *aff'd*, 776 F. App'x 530 (9th Cir. 2019); *Pauu v. Cnty.

24   of San Diego*, No. 23-cv-02162-TWR-SBC, 2024 WL 2980793, at *21 (S.D. Cal. June 13, 2024)

25   ("Because Talavera does not allege any facts from which the Court can infer the existence of a

26   special relationship between Talavera and Martinez or Gore, he fails to allege a plausible claim

27   for supervisory liability against them.").

28   /////

Therefore, defendants' motion to dismiss plaintiffs' negligence claim asserted against defendant Woo will be granted, but with leave to amend.  *See Cook*, 911 F.2d at 247.

**H.     Wrongful Death Claim Against Defendant Woo**

A wrongful death claim may be brought by the "surviving spouse, domestic partner, children, and issue of deceased children" of the decedent.  Cal. Civ. Proc. Code § 377.60(a).  The elements required for a wrongful death claim are:  "(1) a 'wrongful act or neglect' on the part of one or more persons that (2) 'cause[s]' (3) the 'death of [another] person.'"  *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 390 (1999) (quoting Cal. Code Civ. Proc. § 377.60).  The causation standard for a wrongful death claim is the same as in a negligence claim:  the plaintiff "must demonstrate that the defendant's conduct was a substantial factor in bringing about the injury or death." *Sinclair for Tucker v. Twitter, Inc.*, No. 17-cv-05710-SBA, 2019 WL 10252752, at *7 (N.D. Cal. Mar. 20, 2019), *aff'd sub nom. Copeland v. Twitter, Inc.*, No. 18-17327, 2024 WL 1406742 (9th Cir. Apr. 2, 2024); *Sandoval v. Bank of Am.*, 94 Cal. App. 4th 1378, 1385 (2002) ("[T]he causation element of negligence is satisfied when the plaintiff establishes (1) that the defendant's breach of duty . . . was a substantial factor in bringing about the plaintiff's harm and (2) that there is no rule of law relieving the defendant of liability.").

Here, plaintiffs allege, in a conclusory fashion, that "Wayne Woo caused Christopher Temple's death by wrongful acts and neglect, including, among other actions, by maintaining policies or customs of action and inaction which resulted in harm to Christopher Temple."  (Doc. No. 12 at ¶ 197.)  For the reasons already stated above, the court concludes that plaintiffs have failed to adequately allege that defendant Woo was negligent or that his purported conduct of "maintaining policies or customs of action and inaction" directly contributed to the shooting of, or the alleged delay in providing medical care to, the decedent.

Accordingly, defendants' motion to dismiss the wrongful death claim as asserted against defendant Woo will be granted, but with leave to amend.  *See Cook*, 911 F.2d at 247.

/////

/////

/////

**CONCLUSION**

For the reasons explained above,

1.     Defendants' motion to dismiss (Doc. No. 14) is granted in part and denied in part as follows:

    a.     Plaintiffs' claims brought under § 1983 (claims one, two, five, and six), as asserted against defendants County of Placer, Placer County Sheriff's Office, and Wayne Woo, are dismissed with leave to amend;

    b.     Plaintiffs' claims brought under § 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act (claims three and four) are dismissed with leave to amend;

    c.     Plaintiffs' claims brought under Article I, § 13 of the California Constitution (claims seven and eight), as asserted against defendant Wayne Woo, are dismissed with leave to amend;

    d.     Plaintiffs' Bane Act, negligence, and wrongful death claims (claims nine, twelve, and thirteen), as asserted against defendant Wayne Woo, are dismissed with leave to amend;

    e.     Defendants' motion to dismiss is otherwise denied; and

2.     Within twenty-one (21) days from the date of entry of this order, plaintiffs shall file either a second amended complaint, or a notice of their intent not to file a second amended complaint and to proceed only on the claims found to be cognizable in this order or not challenged by defendants.

IT IS SO ORDERED.

Dated:   **August 8, 2024**                    _Dale A. Drozd_

                                          DALE A. DROZD
                                        UNITED STATES DISTRICT JUDGE