1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ESTATE OF CHRISTOPHER TEMPLE,          No.  2:23-cv-01713-DAD-CKD
     et al.,
12
                  Plaintiffs,
13                                           ORDER DENYING DEFENDANTS'
           v.                                MOTION TO DISMISS
14
     PLACER COUNTY SHERIFF'S OFFICE,         (Doc. No. 28)
15   et al.,
16                Defendants.

17

18          This matter is before the court on defendants' motion to dismiss filed on September 11,

19   2024.  (Doc. No. 28.)  Defendants' motion was taken under submission on the papers pursuant to

20   Local Rule 230(g).  (Doc. No. 29.)  For the reasons explained below, defendants' motion to

21   dismiss will be denied.

22                                   **BACKGROUND**

23          This action arises from the death of Christopher Temple (the "decedent") on or about

24   January 11, 2023.  On August 14, 2023, the estate of the decedent (the "estate") and Amber Smith

25   (collectively, "plaintiffs") filed this suit.  (Doc. No. 1.)  On August 28, 2024, plaintiffs filed their

26   second amended complaint ("SAC"), asserting claims against defendants County of Placer and

27   Placer County Sheriff's Office (collectively, the "municipal defendants"), as well as defendants

28   /////

                                            1

1  Sheriff Wayne Woo,[1] Deputy Melissa Adams, Deputy Claudell Vaughan, and Deputy Cody

2  Michael in their individual capacities.  (Doc. No. 27.)

3  　　　In their SAC, plaintiffs allege as follows.  On January 10, 2023, around 11:50 p.m., the

4  decedent was driving a vehicle in Auburn, California.  (*Id.* at ¶ 22.)  The decedent's vehicle was

5  pulled over by defendant Deputy Vaughan due to expired vehicle registration.  (*Id.* at ¶¶ 23, 24.)

6  Defendant Deputies Michael and Adams then arrived at the scene.  (*Id.* at ¶ 26.)  Defendant

7  Vaughan spoke to the decedent through the passenger door of the pulled-over vehicle and then

8  returned to his patrol vehicle to run a records search of the decedent.  (*Id.* at ¶¶ 28, 29.)

9  　　　Defendant Adams approached the driver-side door of the pulled-over vehicle, where the

10  decedent sat in the driver's seat.  (*Id.* at ¶ 30.)  She observed that the decedent's behavior was odd

11  and suspected that he might have mental health issues.  (*Id.* at ¶ 31.)  She asked the decedent if he

12  was on parole, and the decedent responded that he was on probation.  (*Id.* at ¶¶ 32, 33.)

13  Defendant Adams concluded that the decedent was a known criminal with a disregard for the law

14  and she wanted more control of the situation.  (*Id.* at ¶ 34.)  Defendant Adams then reached into

15  the decedent's vehicle through the opened window and grabbed hold of the decedent's arms or

16  hands, without warning or explanation.  (*Id.* at ¶ 35.)  This confused and frightened the decedent,

17  causing him to reflexively pull away from defendant Adams's grasp.  (*Id.* at ¶¶ 36, 37.)

18  Defendant Adams ordered the decedent to give her his hands, to which the decedent asked why

19  and told her not to touch him.  (*Id.* at ¶¶ 38, 39.)  Defendant Adams struggled with the decedent

20  through the open window.  (*Id.* at ¶ 40.)

21  　　　As defendant Adams struggled with the decedent, defendants Michael and Vaughan

22  approached the vehicle.  (*Id.* at ¶ 42.)  Defendant Adams then called out a warning, "Gun! Gun!

23  Gun!," falsely signaling to defendants Michael and Vaughan that a gun was present where there

24  was none.  (*Id.* at ¶ 43.)

25  /////

26

27  _____

[1]  In their SAC, plaintiffs allege that defendant Woo has been employed by the municipal
defendants since 1994, including in a supervisory capacity since at least 2012, and was elected
28  Sheriff in June 2022.  (Doc. No. 27 at ¶ 104.)

Defendants Michael, Adams, and Vaughan (collectively, the "defendant deputies") backed away from the vehicle, unholstered and drew their firearms which they pointed at the decedent. (*Id.* at ¶¶ 44, 45.)  The decedent exited the vehicle holding a two and one-half-inch blade pocketknife in his right hand.  (*Id.* at ¶ 47.)  He then walked approximately 30 feet in front of his vehicle and away from the defendant deputies.  (*Id.* at ¶ 48.)

Defendant Adams ordered the decedent to drop the knife.  (*Id.* at ¶ 49.)  The decedent stopped walking away from the officers, turned to face them, and yelled for them to shoot him. (*Id.* at ¶¶ 50, 52.)  Plaintiffs allege that the defendant deputies knew, or should have known, that the decedent was suffering from a mental disability or mental health crisis.  (*Id.* at ¶ 53.)

After an approximately 25-second stand-off, the decedent took a few steps towards the defendant deputies, who backed up slightly, and then he took two large steps towards them.  (*Id.* at ¶¶ 59, 60, 61.)  Defendants Adams and Vaughan fired several gunshots at the decedent, striking him.  (*Id.* at ¶ 62.)  The decedent fell to the ground in front of the vehicle, and he dropped the pocketknife.  (*Id.* at ¶¶ 63, 64.)  According to plaintiffs, the defendant deputies had less-lethal options available but failed to use them.  (*Id.* at ¶ 54.)

The decedent was injured and bleeding from the gunshots.  (*Id.* at ¶ 65.)  The defendant deputies continued to point their firearms at the decedent as he lay on the ground.  (*Id.* at ¶ 67.) They then approached him with firearms pointed at him for approximately 25 seconds.  (*Id.* at ¶¶ 68, 70.)  Defendants Michael and Vaughan verbally noted the pocketknife on the ground but did not move it, despite having the opportunity to do so.  (*Id.* at ¶¶ 71, 72.)

The defendant deputies backed up from where the decedent was lying on the ground.  (*Id.* at ¶ 73.)  The decedent picked himself up from the ground and grabbed the small pocketknife. (*Id.* at ¶ 75.)  The decedent was visibly limping and took one step towards the defendant deputies. (*Id.* at ¶ 77.)  Defendants Michael and Adams then shot the decedent, striking him with several more gunshots.  (*Id.* at ¶ 79.)  Defendant Vaughan did not shoot the decedent a second time.  (*Id.* at ¶ 80.)  The decedent fell to the ground next to his vehicle and dropped the pocketknife.  (*Id.* at ¶¶ 82, 83.)  He sustained approximately seven gunshot wounds in total.  (*Id.* at ¶ 84.)

/////

3

1    The defendant deputies left the decedent on the ground for approximately 50 seconds after

2    he was shot the second time.  (*Id.* at ¶ 85.)  Defendant Vaughan told the dispatcher, "Don't send

3    in medical yet."  (*Id.* at ¶ 86.)  Defendants Adams and Vaughan applied handcuffs to the

4    decedent's arms, securing them behind his back, despite it being obvious that handcuffs were

5    unnecessary and would impede the decedent's access to immediate medical attention.  (*Id.* at

6    ¶¶ 87, 88.)  While defendant Adams and Vaughan applied handcuffs, defendant Michael stood

7    over the decedent, pointing a firearm at his head.  (*Id.* at ¶ 89.)  Defendant Adams began applying

8    CPR techniques to the decedent approximately 2 minutes and 30 seconds after the decedent had

9    fallen to the ground following the second volley of gunshots.  (*Id.* at ¶ 91.)

10    The decedent died at the scene.  (*Id.* at ¶ 94.)  The decedent's cause of death was

11    identified as gunshot wounds to the chest and lower torso.  (*Id.* at ¶ 95.)

12    On May 31, 2023, Lieutenant Matthew Hardcastle made findings in Administrative

13    Investigation FN2023-0002, which concluded that the defendant deputies were justified, lawful,

14    and proper in their actions with respect to the January 11, 2023 incident.  (*Id.* at ¶ 102(a)–(d).)

15    The findings further concluded that the defendant deputies complied with the Placer County

16    Sheriff's Office's policies regarding the discharge of firearms, rendering medical aid, personal

17    conduct, and use of physical force.  (*Id.*)  Captain Brian Silva concurred with these findings,

18    recommending that the defendant deputies be exonerated and that the investigation be closed.

19    (*Id.* at ¶ 103.)

20    In their SAC, plaintiffs assert the following thirteen claims:  (1) a 42 U.S.C. § 1983 claim

21    for excessive use of force in violation of the Fourth Amendment asserted by the estate against the

22    municipal defendants and the defendant deputies; (2) a § 1983 claim for "unreasonable medical

23    care" in violation of the Fourth Amendment asserted by the estate against the defendant deputies;

24    (3) a claim under 29 U.S.C. §§ 701, *et seq.* for a violation of § 504 of the Rehabilitation Act

25    asserted by the estate against the municipal defendants; (4) a claim under 42 U.S.C. §§ 12101, *et*

26    *seq.* for a violation of Title II of the Americans with Disabilities Act ("ADA") asserted by the

27    estate against the municipal defendants; (5) a § 1983 claim for interference with familial

28    association in violation of the Fourteenth Amendment asserted by plaintiff Smith against the

4

municipal defendants and the defendant deputies; (6) a § 1983 claim for interference with familial association in violation of the First Amendment asserted by plaintiff Smith against the municipal defendants and the defendant deputies; (7) a claim under Article I, § 13 of the California Constitution for excessive use of force asserted by the estate against the municipal defendants and the defendant deputies; (8) a claim under Article I, § 13 of the California Constitution for unreasonable medical care asserted by the estate against the municipal defendants and the defendant deputies; (9) a claim under California Civil Code § 52.1 (the "Bane Act") asserted by both plaintiffs against the municipal defendants and the defendant deputies; (10) an assault and battery claim asserted by the estate against the municipal defendants and the defendant deputies; (11) an intentional infliction of emotional distress claim asserted by the estate against the municipal defendants and the defendant deputies; (12) a negligence claim asserted by the estate against all defendants; and (13) a wrongful death claim under § 377.60 of the California Code of Civil Procedure asserted by plaintiff Smith against all defendants.  (Doc. No. 27.)  The SAC also alleges that multiple incidents of police misconduct have occurred over the last fifteen years involving the Placer County Sheriff's Department, with some resulting in large monetary settlements being reached.  (*See id.* at ¶ 108.)  Based upon those previous incidents, plaintiffs allege a pattern and practice of police misconduct, including that defendant Woo maintained inadequate policies and failed to adequately train, supervise, and discipline personnel regarding excessive force.  (*Id.* at ¶¶ 104–18.)

On December 1, 2023, defendants filed a motion to dismiss plaintiffs' first amended complaint ("FAC").  (Doc. No. 14.)  On August 9, 2024, the court issued an order granting in part and denying in part defendants' motion to dismiss.  (Doc. No. 26.)  The court granted leave to amend as to the dismissed claims.  (*Id.*)

Plaintiffs filed their SAC on August 28, 2024.  (Doc. No. 27.)  On September 11, 2024, defendants filed the pending motion to dismiss certain claims asserted in plaintiffs' SAC.  (Doc. No. 28.)  On September 24, 2024, plaintiffs filed their opposition to the pending motion to dismiss, and on October 4, 2024, defendants filed their reply thereto.  (Doc. Nos. 31, 32.)

/////

**LEGAL STANDARD**

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of the complaint. *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). A plaintiff is required to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In determining whether a complaint states a claim on which relief may be granted, the court accepts as true the allegations in the complaint and construes the allegations in the light most favorable to the plaintiff. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). However, the court need not assume the truth of legal conclusions cast in the form of factual allegations. *U.S. ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986). While Rule 8(a) does not require detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Moreover, it is inappropriate to assume that the plaintiff "can prove facts that it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

**ANALYSIS**

**A.    *Monell* Claim**

Defendants first seek the dismissal of plaintiffs' § 1983 claim for excessive force (claim one) brought against the municipal defendants based on alleged municipal liability under *Monell*

/////

6

1    *v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).  (Doc. No. 28-1 at

2    13–19.)

3            It is well-established that "a municipality cannot be held liable *solely* because it employs a

4    tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat*

5    *superior* theory."  *Monell*, 436 U.S. at 691; *see also Bd. of Cnty. Comm'rs v. Brown*, 520 U.S.

6    397, 403 (1997).  To state a *Monell* claim against a municipality, a plaintiff must allege facts

7    demonstrating "that an 'official policy, custom, or pattern' on the part of [the municipality] was

8    'the actionable cause of the claimed injury.'"  *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143

9    (9th Cir. 2012) (quoting *Harper v. City of Los Angeles*, 533 F.3d 1010, 1022 (9th Cir. 2008)); *see*

10   *also Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1247 (9th Cir. 2016) (explaining that in order

11   to establish municipal liability under § 1983, a plaintiff must show a direct causal link between

12   the municipal policy or custom and the alleged constitutional violation).

13           The Ninth Circuit has recognized four theories for establishing municipal liability under

14   *Monell*:  "(1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise,

15   or discipline; or (4) a decision or act by a final policymaker."  *Horton by Horton v. City of Santa*

16   *Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019).  "Cases often refer to the fourth theory as

17   'ratification' by a final policymaker."  *Thurston v. City of Vallejo*, No. 2:19-cv-01902-KJM-CKD,

18   2021 WL 1839717, at *3 (E.D. Cal. May 7, 2021).  Plaintiffs proceed here under the second,

19   third, and fourth theories.  For the reasons discussed below, the court finds that plaintiffs' *Monell*

20   claim is sufficiently alleged.

21           1.    Practice and Custom Theory

22           To establish liability under the pervasive practice and custom theory, a plaintiff must

23   allege and show a "longstanding practice or custom which constitutes the standard operating

24   procedure of the local government entity."  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996)

25   (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992)).  "The custom must be so

26   'persistent and widespread' that it constitutes a 'permanent and well settled city policy.'"

27   *Trevino*, 99 F.3d at 918 (quoting *Monell*, 436 U.S. at 691).  "Liability for improper custom may

28   not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient

1  duration, frequency and consistency that the conduct has become a traditional method of carrying

2  out policy." *Trevino*, 99 F.3d at 918.

3        The court acknowledges that "[t]he line between 'isolated or sporadic incidents' and

4  'persistent and widespread conduct' is not clearly delineated." *Warkentine v. Soria*, No. 1:13-cv-

5  01550-LJO-MJS, 2014 WL 2093656, at *6 (E.D. Cal. May 19, 2014); *see also Gonzalez v. Cnty.*

6  *of Merced*, 289 F. Supp. 3d 1094, 1099 (E.D. Cal. 2017) ("It is difficult to discern from the

7  caselaw the quantum of allegations needed to survive a motion to dismiss a pattern and practice

8  claim."). As previously observed by another judge of this district, "[p]erhaps the most that can be

9  said is that one or two incidents ordinarily cannot establish a policy or custom, while more

10  incidents may permit the inference of a policy, taking into account their similarity, their timing,

11  and subsequent actions by the municipality." *J.M. ex rel. Rodriguez v. Cnty. of Stanislaus*, No.

12  1:18-cv-01034-LJO-SAB, 2018 WL 5879725, at *5 (E.D. Cal. Nov. 7, 2018).

13        Here, plaintiffs plead that the alleged violation of the decedent's rights resulted from the

14  inadequate policies and procedures of the municipal defendants and defendant Woo. (Doc. No.

15  27 at ¶ 118.) Plaintiffs allege that these defendants participated in or acquiesced to the creation

16  and maintenance of a culture permitting or encouraging unreasonable force, and in support, they

17  describe eight other incidents of unreasonable force by Placer County deputies since 2010. (*Id.* at

18  15–18.) They allege that in spite of these events, the municipal defendants and defendant Woo

19  "failed meaningfully to discipline, re-train, or hold accountable any of the personnel involved . . .

20  despite obvious and documented misconduct." (*Id.* at ¶ 109.)

21        Defendants argue that to the extent plaintiffs' SAC now relies on eight prior shootings

22  involving the Placer County Sheriff's Office, those are "random acts" in which it is "entirely

23  unclear . . . whether the facts and circumstances [] are factually similar" and plaintiffs' allegations

24  "lack specificity regarding the response to the call for service." (Doc. No. 28-1 at 14–15.) They

25  also argue that the SAC only "vaguely cites" to various policies but does not plead the "specific

26  contents within these policies, or how any of these policies are the moving force behind a

27  constitutional violation." (*Id.* at 14.) In opposition, plaintiffs argue that their allegations are

28  sufficient to place the municipal defendants on notice and that defendants' arguments are too

granular for the pleading stage. (Doc. No. 31 at 8–10.) In reply, defendants argue that the eight other incidents in plaintiffs' SAC are "factually different" because they do not involve "a traffic stop and a suspect attempting to seriously injury [sic] deputies by stabbing them with a knife" and that if plaintiffs' allegations are sufficient, then "every public agency would be subject to *Monell* liability virtually every time force was used to apprehend a subject." (Doc. No. 32 at 4–5.)

a.    *Plaintiffs Sufficiently Allege Other Similar Incidents*

The court finds that the past incidents that plaintiffs have identified in their SAC are sufficient to plausibly plead a "policy of inaction and an attitude of indifference towards ongoing law enforcement use of force incidents" which "did proximately cause the . . . escalation of force against, officer-involved shooting of, and death of [the decedent]." (Doc. No. 27 at ¶¶ 107, 118.) Several of the incidents alleged do reflect significant facial similarities to the allegations of the decedent's death in this case, particularly with regards to the circumstances involving a traffic stop, an allegedly mentally-impaired person holding a potentially harmful instrument, and the deployment of multiple rounds of gunfire. *See id.* at 15–18 (alleging that Placer County deputies: (a) shot a fleeing man, who was experiencing a mental health episode and holding a handgun, multiple times; (b) shot a man during a traffic stop at close range multiple times; (c) shot a man suffering from a mental health episode while holding a barbecue fork multiple times at close range; (d) shot a man fleeing a traffic stop; (e) shot a man holding a 5-inch knife following a reported domestic disturbance; (f) approached a parked car and encountered a man who was "impaired," "slow," and "unintelligible" and, upon seeing a gun on the passenger seat, fired four shots and killed him; (g) shot a man three times in the back as he was fleeing a stolen vehicle; and (h) shot and killed a man attempting to flee deputies by vehicle); *see also Adams v. City of Redding*, No. 2:20-cv-01610-TLN-DMC, 2022 WL 16964025, at *5 (E.D. Cal. Nov. 16, 2022) (finding sufficient similarity where the plaintiff identified other instances of excessive force, including "the use of force on individuals that posed no immediate threat" which was allegedly the case with the plaintiff). Further, in cases brought following at least some of these alleged instances, the defendants agreed to pay a substantial monetary sum to resolve excessive use of force claims brought against them. (Doc. No. 27 at 16–18) (alleging that civil rights lawsuits

9

1  regarding three of these instances settled before trial—one for $9.9 million, one for $825,000, and

2  one for an unstated amount).

3       The court is not persuaded by defendants' argument that these incidents are so factually

4  different that they are simply random acts.  The precise level of similarity, and whether these

5  previous incidents "are all manifestations of the same policy or custom, and whether that policy

6  or custom was the moving force behind the injury to decedent in this case, are factual issues to be

7  determined following the discovery phase of this litigation." *Est. of Osuna v. Cty. of Stanislaus*,

8  392 F. Supp. 3d 1162, 1173 (E.D. Cal. 2019); *see also Ochoa v. City of San Jose*, No. 21-cv-

9  02456-BLF, 2021 WL 7627630, at *6 (N.D. Cal. Nov. 17, 2021) (noting that the defendants

10  "quibble with the factual similarity of several of these prior incidents" but "find[ing] that the

11  issues [the d]efendants raise are too granular for the pleading stage"); *Adams*, 2022 WL

12  16964025, at *5 ("Defendant argues the prior incidents are not sufficiently similar because they

13  did not involve a single, fatal gunshot to a driver, but the factual similarity requirement is not as

14  rigorous as Defendant argues.").  The court also rejects defendants' argument that if plaintiffs'

15  allegations are sufficient here, "every public agency would be subject to *Monell* liability virtually

16  every time force was used to apprehend a subject." (Doc. No. 32 at 4–5.)  Plaintiffs have not

17  simply alleged that "force was used" against the decedent, and that "force was used" in eight

18  other incidents.  Plaintiffs have alleged that here the decedent was killed by deputies after being

19  shot multiple times while holding a pocket knife during a traffic stop, and they have alleged eight

20  other instances of Placer County deputies using deadly force in sufficiently similar circumstances.

21  The undersigned is satisfied that in light of these allegations, plaintiffs' SAC plausibly alleges the

22  existence of a policy or custom pursuant to *Monell*.  *See Est. of Osuna*, 392 F. Supp. 3d at 1173

23  (finding the plaintiffs' allegations of numerous prior incidents involving excessive use of force,

24  including three substantial settlements, were a sufficient basis upon which to plausibly allege the

25  existence of a policy or custom).

26  /////

27  /////

28  /////

1              b.      *Plaintiffs Sufficiently Describe the Policy or Custom*

2              As noted, defendants also raise the argument that plaintiffs' SAC "vaguely cites" to

3       various policies but does not plead the "specific contents within these policies, or how any of

4       these policies are the moving force behind a constitutional violation."  (Doc. No. 28-1 at 14.)

5              The Ninth Circuit has made clear that *Monell* claims "may not simply recite the elements

6       of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice

7       and to enable the opposing party to defend itself effectively."  *A.E. ex rel. Hernandez v. County of

8       Tulare*, 666 F.3d 631, 637 (9th Cir. 2012).  In addition to sufficient factual allegations, however,

9       some district courts have held that plaintiffs must also identify the particular policy or custom that

10      caused the constitutional violation without resorting to conclusory allegations.  *See Johnson v.

11      Cate*, No. 1:10-cv-00803-AWI-MJS, 2012 WL 1076209, at *3 (E.D. Cal. Mar. 29, 2012)

12      (requiring plaintiff to "describ[e] in detail a county policy that was the moving force behind the

13      alleged constitutional violations").  Other district courts have adopted a more lenient pleading

14      standard, holding that while a complaint must include a sufficient quantum of factual material to

15      plausibly suggest the existence of a policy or custom, the policy or custom itself need not be

16      specifically alleged, or may be alleged only in a general fashion.  S*ee Duenez v. City of Manteca*,

17      No. 11-cv-01820-LKK-KJN, 2012 WL 4359229, at *9 (E.D. Cal. Feb. 23, 2012) ("Plaintiffs need

18      not articulate the intricacies of the alleged policy further at the pleading stage.").

19             The undersigned has previously adopted the latter standard, concluding that "the details of

20      the alleged policy or custom [] is a topic properly left to development through discovery" because

21      "[i]t is a rare plaintiff who will have access to the precise contours of a policy or custom prior to

22      having engaged in discovery, and requiring a plaintiff to plead its existence in detail is likely to be

23      no more than an exercise in educated guesswork."  *Est. of Osuna*, 392 F. Supp. 3d at 1174.  Other

24      district courts have subsequently agreed with this perspective and adopted a similar standard.  *See

25      Ochoa*, 2021 WL 7627630, at *8 ("[T]he Court is not sure what Defendants expect Plaintiff to

26      plead at this point.  At the pleading stage, Plaintiff is unlikely to have details of how a police

27      department trains its officers—these are the kinds of details that are likely to emerge during

28      discovery.  Further, the Court notes that based on Plaintiff's allegations regarding the facts of

                                              11

1    some of the prior incidents—several of which facially involve outrageously excessive acts of

2    police violence—inadequate or deficient training is at least a reasonable inference.  The Court

3    agrees with other courts in the Ninth Circuit that have found allegations about prior incidents

4    sufficient without the details Defendants seek."); *Alvarado v. Cnty. of San Bernardino*, No. 23-

5    cv-00629-DSF-JC, 2023 WL 11053616, at *2 (C.D. Cal. Aug. 14, 2023); *Rodriguez v. Cnty. of*

6    *Los Angeles*, No. 20-cv-10671-FMO-JEM, 2021 WL 4434973, at *1 (C.D. Cal. May 24, 2021);

7    *Sanders v. City of Nat'l City*, No. 20-cv-00085-AJB-BLM, 2020 WL 6361932, at *5 (S.D. Cal.

8    Oct. 29, 2020).  Accordingly, the court reaffirms its conclusion that while a "complaint must

9    plausibly allege the existence of a policy or custom that was the moving force behind the

10   constitutional violation at issue, the policy or custom itself need only be alleged in general terms."

11   *Est. of Osuna*, 392 F. Supp. 3d at 1175.

12       As noted above, plaintiffs' SAC identifies multiple prior instances of alleged excessive

13   force by the municipal defendants and alleges that these actions and the events underlying the

14   present case occurred due to inadequate training, discipline, accountability, and a policy of

15   permitting or encouraging use of unreasonable force.  (Doc. No. 27 at ¶¶ 108–118.)  The court

16   finds that these descriptions of the policies and customs at issue, although not particularly

17   detailed, are sufficient at this stage of the litigation to place defendants on notice of the nature of

18   the claims brought against them and allow them to prepare an adequate defense.  *Est. of Osuna*,

19   392 F. Supp. 3d at 1175 (finding that "the plaintiff estate has identified multiple prior instances of

20   alleged misconduct" and "alleges that these actions occurred due to either a lack of training, or a

21   policy of employing excessive and unreasonable force" which, while not "particularly detailed,"

22   were sufficient allegations to survive the defendants' motion to dismiss).

23       Accordingly, defendants' motion to dismiss plaintiffs' claim for failure to adequately

24   plead the "practice or custom" theory of *Monell* liability will be denied.

25       2.    Failure to Train and Ratification Theories

26       In their pending motion to dismiss, defendants also argue that plaintiffs have failed to

27   properly allege the failure to train and ratification theories of their *Monell* claim.  (Doc. No. 28-1

28   at 15–19.)  But because plaintiffs have stated a claim through their practice or custom theory, it is

1  not necessary to evaluate their failure to train and ratification theories at this stage of the

2  litigation.  *See Quinto-Collins v. City of Antioch*, No. 21-cv-06094-VC, 2022 WL 18574, at *2

3  (N.D. Cal. Jan. 3, 2022) ("Because the plaintiffs have stated a Section 1983 claim against the City

4  by virtue of their ratification theory, it is not necessary to evaluate their failure-to-train theory at

5  this stage. . . .  [G]enerally speaking, when a plaintiff makes two different arguments in support

6  of one basis for relief, the plaintiff is not bringing two separate claims. . . .  In the context of

7  *Monell*, the different theories of liability (e.g., ratification, failure to train) are best understood []

8  as different arguments in support of a single claim.  Here, the plaintiffs have stated a claim for

9  municipal liability, so they may pursue that claim—and different theories in support of it—in this

10 case.")  Accordingly, the court will not reach defendants' arguments as to plaintiffs' other

11 theories of *Monell* liability.  *See Est. of Verdugo v. City of El Centro*, No. 20-cv-02458-W-KSC,

12 2022 WL 16577870, at *5 (S.D. Cal. Nov. 1, 2022) ("Since the Court finds that Plaintiffs' factual

13 allegations as to the City's failure to train sufficiently state a claim for a violation of § 1983, the

14 Court does not reach Defendant's arguments as to Plaintiffs' other theories.") (citing *Haddock v.*

15 *Bd. of Dental Exam'rs of Cal.*, 777 F.2d 462, 464 (9th Cir. 1985) (stating that "a complaint

16 should not be dismissed if it states a claim under any legal theory")).

17 **B.      Rehabilitation Act and ADA Claims**

18      Defendants next move to dismiss plaintiffs' third and fourth claims for relief, which assert

19 violations of § 504 of the Rehabilitation Act and Title II of the ADA.  (Doc. No. 28-1 at 19–23.)

20      "Title II of the ADA prohibits public entities from discriminating on the basis of

21 disability.  Section 504 [of the Rehabilitation Act] similarly prohibits disability discrimination by

22 recipients of federal funds."  *Payan v. L.A. Cmty. Coll. Dist.*, 11 F.4th 729, 737 (9th Cir. 2021)

23 (citing 42 U.S.C. § 12132; 29 U.S.C. § 794).  "The two laws are interpreted coextensively

24 because 'there is no significant difference in the analysis of rights and obligations created by the

25 two Acts.'"  *Payan*, 11 F.4th at 737 (quoting *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725

26 F.3d 1088, 1098 (9th Cir. 2013)).

27      To state a claim for disability discrimination, "the plaintiff must allege four elements:

28 (1) the plaintiff is an individual with a disability; (2) the plaintiff is otherwise qualified to

1  participate in or receive the benefit of some public entity's services, programs, or activities;

2  (3) the plaintiff was either excluded from participation in or denied the benefits of the public

3  entity's services, programs, or activities, or was otherwise discriminated against by the public

4  entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's

5  disability." *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002).

6        Further, when "Title II plaintiffs seek monetary damages, they must also show that the

7  defendants acted with discriminatory intent.  This requires a showing of deliberate indifference."

8  *Almarou v. City of Gardena*, No. 18-cv-04908-CJC, 2019 WL 7945590, at *5 (C.D. Cal. Dec. 30,

9  2019) (internal citation omitted).  "Deliberate indifference requires both knowledge that a harm to

10  a federally protected right is substantially likely, and a failure to act upon that the likelihood."

11  *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001), *as amended on denial of reh'g*

12  (Oct. 11, 2001).

13        Here, defendants argue that plaintiffs have failed to allege the first element, namely, that

14  the decedent was an individual with a disability.  (Doc. No. 28-1 at 20.)  They also argue that in

15  the alternative, plaintiffs "have not plead how deputies failed to accommodate" the decedent, and

16  thus have failed to allege discrimination as required by the third element of disability

17  discrimination.  (*Id*. at 21.)  Finally, defendants argue that plaintiffs have alleged "no facts that

18  could establish intentional discrimination by the deputies." (*Id*. at 22.)  In opposition, plaintiffs

19  argue that the allegations of their SAC do articulate the decedent's mental impairment and that

20  the defendants' other arguments must be rejected as raising questions of fact.  (Doc. No. 31 at 15–

21  18.)  The court will address each argument in turn.

22        1.    <u>Whether Plaintiffs have Alleged a Disability</u>

23        With respect to the first element, the ADA defines "disability" as:

24            (A) a physical or mental impairment that substantially limits one or
          more of the major life activities of such individual;

25

26            (B) a record of such an impairment; or

27            (C) being regarded as having such an impairment . . . .

28  /////

14

42 U.S.C. § 12102(1).  Mental impairments include "[a]ny mental or psychological disorder" including, among other things, "emotional or mental illness."  28 C.F.R. § 36.105.

In its previous order, the court dismissed plaintiffs' Rehabilitation Act and ADA claims with leave to amend for failure to "articulate the 'mental impairment' that the decedent allegedly suffered from."  (Doc. No. 26 at 17.)  Upon amendment, plaintiffs have specified that the decedent "struggled with mental health and substance abuse issues during the course of his life, including substance use disorder, depression, suicidal ideation, and paranoia for which he was hospitalized, received mental health treatment, and was prescribed medications including Suboxone, Seroquel, Klonopin, Neurontin, and others."  (Doc. No. 27 at ¶ 17.)  Plaintiffs also maintain their previously advanced allegations that the decedent "periodically experienced mental health episodes," "was known to act irrationally when exhibiting symptoms of his disabilities, including expressing suicidal ideation," and that his "medical records document mental health and substance abuse issues."  (*Id*. at ¶¶ 18, 20, 21.)  They also continue to allege that the decedent's "disabilities substantially limited major life activities, including, but not limited to, caring for oneself, speaking, concentrating, thinking, and communicating," because his "disabilities caused him to become paranoid, easily confused, defensive, agitated, stressed, fearful, and anxious" and "made it difficult for him to process relayed information and to verbalize his own thoughts, feelings, and intentions."  (*Id*. at ¶ 19.)

Defendants argue that plaintiffs' allegations "remain insufficient to plausibly suggest that Decedent had a disability" because they "do not sufficiently state the mental impairment or disability which impacted Decedent" or "any specific life activities that are limited."  (Doc. No. 28-1 at 20.)  In opposition, plaintiffs argue that their allegations are sufficient because they have identified more than the general nature of the disability and because Congress intended the term 'disability' to have broad coverage.  (Doc. No. 31 at 15–16.)

"[A] successful plaintiff will usually allege that he or she suffered from a specific, recognized mental or physical illness."  *Bresaz v. County of Santa Clara*, 136 F. Supp. 3d 1125, 1136 (N.D. Cal. 2015) (finding that the plaintiffs' vague allegation that the decedent "had a history of mental illness" was insufficient "to constitute a mental impairment under the ADA").

1    Here, while the plaintiffs in their FAC previously alleged merely that the decedent had

2    "diagnosed conditions for which he was prescribed medications," (Doc. No. 12 at ¶ 17), they now

3    in their SAC have specified that the decedent "struggled with . . . substance use disorder,

4    depression, suicidal ideation, and paranoia" and have identified more specifically the medications

5    (Suboxone, Seroquel, Klonopin, and Neurontin) and treatment (hospitalization, mental health

6    treatment, and medication) that he received for his mental health conditions.  (Doc. No. 27 at

7    ¶ 17.)  The SAC also alleges how these mental conditions interfered with the decedent's ability to

8    care for himself, speak, concentrate, think, and communicate.  (Doc. No. 27 at ¶ 19.)  In light of

9    these allegations regarding the decedent's specific, recognized mental illnesses and treatments

10   and the limitations imposed on his life, the court finds that plaintiffs have now plausibly alleged

11   that the decedent was an individual with a disability.  *See Greenstone v. Las Vegas Metro. Police*

12   *Dep't*, No. 2:23-cv-00290-GMN-NJK, 2024 WL 385213, at *14 (D. Nev. Jan. 31, 2024) (finding

13   that the plaintiffs had plausibly alleged that plaintiff Greenstone was "an individual with a

14   disability" where they alleged that he "suffered from schizophrenia and major depression, which

15   limited his ability to communicate and interact with others and engage in basic self-care");

16   *Almarou*, 2019 WL 7945590, at *5 ("With regard to the first element, Plaintiff has plausibly

17   alleged that [the decedent]—a man who 'suffered from bipolar disorder, causing him at times to

18   lose touch with reality'—was an individual with a disability."); *Lavenant v. City of Palm Springs*,

19   No. 17-cv-02267-KK, 2018 WL 3807944, at *5 (C.D. Cal. Aug. 8, 2018) (finding that the

20   plaintiffs "alleged sufficient facts showing [the decedent] was 'an individual with a disability'"

21   where they alleged that he "was diagnosed as schizophrenic and was 'working with a social

22   worker to apply for disability and seek medical treatment'"); *Est. of Gutierrez ex rel. Benitez v.*

23   *Castillo*, No. 21-cv-01292-H-LL, 2021 WL 5989972, at *9 (S.D. Cal. Dec. 17, 2021) (finding that

24   the "[p]laintiffs have sufficiently alleged [that the decedent] suffered from a qualifying disability"

25   where they alleged that he was "diagnosed with schizophrenia" and "unable to care for himself").

26        2.    Whether Plaintiffs have Alleged Discrimination

27        Defendants next argue that plaintiffs have failed to state a claim for discrimination

28   because they do not "plead how deputies failed to accommodate Decedent during the traffic stop"

16

1    and do not "plead facts establishing that the alleged failure to accommodate caused him to suffer

2    greater injury or indignity than others." (Doc. No. 28-1 at 21–22.) More specifically, defendants

3    argue that the "deputies used de-escalation and spacing techniques by backing up," that no other

4    accommodation "would have been reasonable under the rapidly unfolding circumstances," and

5    that the decedent's injuries are the same as anyone else's "if they charged the deputies with a

6    knife." (Doc. No. 28-1 at 21–22.) In opposition, plaintiffs argue that their SAC contains

7    allegations of a number of reasonable accommodations and that defendants' arguments regarding

8    reasonableness raise questions of fact that cannot inappropriately be resolved at this stage of the

9    litigation. (Doc. No. 31 at 16–17.)

10         In plaintiffs' SAC, they allege that the defendant deputies "failed to provide reasonable

11    accommodation for [the decedent's] disabilities in the course of investigation or arrest, causing

12    greater injury or indignity in that process than other arrestees, where reasonable accommodation

13    was available, including, among other actions, by utilizing persons with specialized training in

14    dealing with mental illness to communicate with [the decedent] in a non-confrontational manner;

15    by approaching [the decedent] in a non-confrontational manner, without displaying or threatening

16    use of force; by speaking to [the decedent] in a non-confrontational manner, with an appropriate

17    tone of voice and without threatening use of force; by interacting with [the decedent] in a non-

18    confrontational manner, including appropriate body language, de-escalation, and spacing

19    techniques; by not using unreasonable and excessive force against [the decedent]; and/or by

20    providing reasonable, timely, and necessary medical care to [the decedent's] gunshot wounds."

21    (Doc. No. 27 at ¶¶ 133, 139, 174.) Defendants acknowledge in their pending motion that

22    plaintiffs' "SAC pleads deputies should have utilized persons with specialized training in mental

23    illness, approaching [the decedent] in a non-confrontational matter [sic], with an appropriate tone

24    of voice, and using appropriate de-escalation and spacing techniques." (Doc. No 28-1 at 21.)

25    Nonetheless, defendants argue that plaintiffs' allegations make clear that the defendant deputies

26    did back up, and no other accommodation would have been reasonable "under the rapidly

27    unfolding circumstances" because "the situation escalated quickly over a 30-second period" so

28    /////

                                                   17

1    the "defendants did not have the time to employ tactics that would have been likely to resolve the

2    situation without injury."  (*Id.*)

3            The court does not find defendants' arguments in this regard to be persuasive.  Rather, the

4    reasonableness of plaintiffs' alleged possible accommodations, and defendants' position that

5    anyone who charges deputies while holding a knife would face the same injuries as those suffered

6    by decedent, simply "cannot be resolved at the pleading stage."  *NAACP of San Jose/Silicon*

7    *Valley v. City of San Jose*, 562 F. Supp. 3d 382, 406 (N.D. Cal. 2021) (denying the defendants'

8    motion to dismiss the plaintiff's ADA and Rehabilitation Act claims where the defendants

9    challenged the reasonableness of any possible accommodations).  In particular, defendants'

10   argument that the timing and rapid escalation of the situation prevented the officers from

11   employing "non-violent means to accommodate Plaintiff's disability" presents a classic "question

12   of fact."  *Evans v. City of San Diego*, No. 23-cv-00883-BAS-WVG, 2024 WL 3907046, at *4

13   (S.D. Cal. Aug. 22, 2024); *see also id.* ("Defendant first argues Plaintiff resisted arrest such that

14   there was no time to consider his disability in their decision to use force.  Again, this argument

15   presents questions of facts which cannot be resolved in a motion to dismiss.  The Ninth Circuit

16   has held whether an accommodation employed during an arrest, or lack thereof, is reasonable is

17   ordinarily a question of fact.") (citing *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211,

18   1233 (9th Cir. 2014), *rev'd in part on other grounds, cert. dismissed in part sub nom. City &*

19   *Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600 (2015)).  Because plaintiffs allege that

20   various accommodations were available to the defendant deputies, and because plaintiffs' own

21   allegations do not indisputably establish the impossibility or unreasonableness of those

22   accommodations, the court rejects defendants' argument that plaintiffs have not alleged

23   discrimination through the failure to reasonably accommodate.  *See Harper v. Cnty. of Merced*,

24   No. 1:18-cv-00562-LJO-SKO, 2018 WL 5880786, at *8 (E.D. Cal. Nov. 8, 2018) ("While the

25   requested accommodation may be deemed unreasonable as a matter of law once the safety

26   concerns for Plaintiff, police officers, and potential bystanders is fully established, the facts of the

27   complaint do not themselves establish the indisputable unreasonableness of the accommodation.

28   City Defendant's motion to dismiss this claim is DENIED.").

1          3.       Whether Plaintiffs have Alleged Deliberate Indifference

2                  Next, defendants argue that in order to seek damages as to the Rehabilitation Act and

3    ADA claims, plaintiffs "must allege facts establishing intentional discrimination on the part of the

4    defendant officers," which requires "showing that the relevant deputies acted with an element of

5    deliberateness." (Doc. No. 28-1 at 22.)  In opposition, plaintiffs argue that they have satisfied the

6    deliberate indifference standard through their allegations regarding the defendant deputies'

7    observations of the decedent's odd and erratic behavior and his statements before any force was

8    used. (Doc. No. 31 at 18.)  In reply, defendants only argue that "the facts alleged clearly point

9    out the deputies were forced to quickly act based on the Temple's actions and conduct." (Doc.

10   No. 32 at 8–9.)

11                 As noted, because "plaintiffs seek monetary damages, they must also show that the

12   defendants acted with discriminatory intent," which "requires a showing of deliberate

13   indifference." *Greenstone*, 2024 WL 385213, at *14.  "Deliberate indifference requires both

14   knowledge that a harm to a federally protected right is substantially likely, and a failure to act

15   upon that the likelihood." *Duvall*, 260 F.3d at 1139.  "Plaintiffs meet the 'knowledge' element of

16   deliberate indifference when they show that either (1) they have 'alerted the public entity to

17   [their] need for accommodation,' or (2) 'the need for accommodation is obvious' enough to put

18   the public entity [] on notice that an accommodation is required." *Almarou*, 2019 WL 7945590,

19   at *6 (quoting *Duvall*, 260 F.3d at 1138).  "To meet the second element of the deliberate

20   indifference test, a failure to act must be a result of conduct that is more than negligent[ ] and

21   involves an element of deliberateness." *Greenstone*, 2024 WL 385213, at *15 (quoting *Duvall*,

22   260 F.3d at 1138).

23                 Defendants do not make clear in their motion to dismiss which element of deliberate

24   indifference they seek to challenge; they simply state that "plaintiffs allege no facts that could

25   establish intentional discrimination." (Doc. No. 28-1 at 22.)  The court disagrees.  First, plaintiffs

26   plead the knowledge requirement through their allegations that defendant Adams observed that

27   the decedent's behavior was odd and suspected that he may have mental health issues, and that

28   the decedent made bizarre statements to the defendant deputies, including:  "Shoot me! Just

1    fucking shoot me! Shoot me! Do it!"  (Doc. No. 27 at ¶¶ 31, 52.)  Plaintiffs allege that "based on

2    his erratic behavior and statements," the defendant deputies "knew, or should have known, that

3    [the decedent] was suffering from a mental disability, including mental illness or a mental health

4    crisis."  (*Id*. at ¶ 53.)  The court finds that these allegations are sufficient to plead the knowledge

5    requirement for deliberate indifference.  *See Lavenant*, 2018 WL 3807944, at *2, 6 (finding that

6    the plaintiffs had sufficiently alleged that the defendants had knowledge where they alleged that

7    the "Defendant Officers should have known [the decedent] was suffering from a mental disability

8    and/or was having a mental health crisis because of the 911 reports that he was behaving

9    erratically and strangely and from their interactions with and observations of him"); *cf. Almarou*,

10   2019 WL 7945590, at *6 (finding that the operative complaint did "not sufficiently allege that

11   [the decedent's] mental disability was obvious enough to put Robbins or the other officers on

12   notice of it" where the plaintiff did "not allege that [the decedent] was exhibiting the type of

13   erratic behavior that would make it obvious to law enforcement that he was suffering from a

14   mental breakdown" and instead "merely alleges that [the decedent] was running down the street

15   in the vicinity of a reported shooting and refused to stop when he encountered law enforcement

16   officers").

17           Second, plaintiffs have also alleged that the conduct at issue involved an element of

18   deliberateness.  In this regard, plaintiffs have alleged that the municipal defendants and defendant

19   Woo "maintained inadequate policies or customs of training, supervision, and discipline of

20   officers under their command related to confrontations with persons experiencing or suffering

21   from documented or apparent mental health crises" and that the shooting of the decedent

22   demonstrates that [the defendant deputies] were not adequately prepared or trained to deal with

23   the situation they encountered."  (Doc. No. 27 at ¶¶ 110, 113.)  Plaintiffs' allegations regarding

24   the shooting, taken as true, suggest that the defendant deputies responded to manifestations of the

25   decedent's mental illness with aggression causing an unnecessary escalation of the situation,

26   given their allegations, for example, that the defendant deputies fired at least seven gunshots,

27   including "several" after the decedent had already been shot at least once and fallen to the ground.

28   (Doc. No. 27 at ¶¶ 62–84.)  The court finds such allegations sufficient to state an element of

deliberateness as required for compensatory damages. *See Lavenant*, 2018 WL 3807944, at *6

(finding that the plaintiffs' allegations that the defendant officers "decided to exacerbate the crisis

by creating an unnecessary altercation" and that defendant Palm Springs failed to train them to

recognize the symptoms of disability were sufficient to state a claim for compensatory damages);

*Partridge v. Smith*, No. 17-cv-02941-CMA-STV, 2019 WL 8370781, at *10 (D. Colo. Dec. 3,

2019) (finding that the plaintiff's "allegations suggest[ing] that officers responded to

manifestations of Plaintiff's mental illness with repeated violence and that they unnecessarily

escalated interactions, or created altercations with Plaintiff" were sufficient to plausibly plead

ADA and Rehabilitation Act claims), *report and recommendation adopted*, No. 17-cv-02941-

CMA-STV, 2020 WL 897653 (D. Colo. Feb. 25, 2020).

        Accordingly, defendants motion to dismiss plaintiffs' third and fourth claims for relief,

asserting violations of § 504 of the Rehabilitation Act and Title II of the ADA, will be denied.

**C.    Unwarranted Interference with Familial Association and Bane Act Claims**

        Defendants next move to dismiss "plaintiffs' fifth and sixth claims against Sheriff Woo

for unwarranted interference with familial association" and "plaintiffs' ninth claim for relief

against Sheriff Woo for Bane Act." (Doc. No. 28-1 at 23–24.) However, as stated above,

plaintiffs' fifth, sixth, and ninth claims are only brought against the municipal defendants and the

defendant deputies, not defendant Woo. (Doc. No. 27 at ¶¶ 142–55, 169–80.) The court will

therefore deny defendants' motion to dismiss as to these claims, since their arguments pertain

only to defendant Woo. *See Nevett v. Renown Health*, No. 3:21-cv-00319-RCJ-CSD, 2022 WL

1288754, at *3 (D. Nev. Apr. 18, 2022) ("[T]he Court cannot dismiss such a non-existent

claim.").

**D.    Negligence Claim Against Defendant Woo**

        Next, defendants move to dismiss plaintiffs' twelfth claim for negligence brought against

defendant Woo. (Doc. No. 28-1 at 25.) In its prior order, the court "construe[d] this claim as a

negligent supervision claim" and granted the defendants' motion to dismiss with leave to amend.

(Doc. No. 26 at 23.)

/////

1        Upon amendment, plaintiffs now allege that defendant Woo owed the decedent a duty of

2  care and breached that duty in three specific ways:

3            (a)  Through his own conduct in creating or increasing an

4            unreasonable risk of harm to [the decedent], including by
          maintaining policies or customs of action and inaction resulting in

5            harm to [the decedent].

6            (b)  Through his special relationship (employer-employee) with [the
          defendant deputies], including by maintaining policies or customs of

7            action and inaction which resulted in harm to [the decedent].

8            (c)  Through his special relationship with, and/or affirmative duty to
          protect, [the decedent], including by maintaining policies or customs

9            of action and inaction which resulted in harm to [the decedent].

10  (Doc. No. 27 at ¶ 196.)  Defendants argue that these allegations are "legal conclusions rather than

11  facts."  (Doc. No. 28-1 at 27.)  In support of this argument, they cite one case in which the

12  undersigned found an allegation that the "defendants were negligent in the performance of his/her

13  custody deputy tactics and duties and this negligence was a cause of decedent's injuries and

14  damages" to be conclusory and not sufficiently descriptive of the defendants' purported conduct.

15  *Est. of Bonilla v. Cnty. of Merced*, No. 1:18-cv-00329-DAD-SKO, 2019 WL 1405551, at *9 (E.D.

16  Cal. Mar. 28, 2019).  However, here plaintiffs have alleged almost a dozen different specific

17  actions or failures to act attributed to defendant Woo.  (*See* Doc. No. 27 at ¶ 107(a)–(k).)

18  Accordingly, the court rejects defendants' arguments that plaintiffs' allegations regarding

19  defendant Woo's conduct and policies of action and inaction are mere legal conclusions.

20        Defendants also challenge just the second theory of liability listed above, arguing that

21  plaintiffs have failed to sufficiently allege a "special relationship."  (Doc. No. 28-1 at 25–27.)

22  However, defendants "have not pointed to any authority demonstrating that [they] may attack

23  portions of a single claim on a motion to dismiss."  *Doe v. Napa Valley Unified Sch. Dist.*, No.

24  17-cv-03753-SK, 2018 WL 4859978, at *2 (N.D. Cal. Apr. 24, 2018); *see also Franklin v.*

25  *Midwest Recovery Sys., LLC*, No. 8:18-cv-02085-JLS-DFM, 2020 WL 3213676, at *1 (C.D. Cal.

26  Mar. 9, 2020) (collecting cases where district courts in the Ninth Circuit have concluded that a

27  defendant may not challenge part of a claim under Rule 12(b)(6).  Accordingly, defendants'

28  /////

1    motion to dismiss plaintiffs' negligence claim as predicated on the special employer-employee

2    relationship theory will be denied.[2]

3           Additionally, defendants argue that plaintiffs cannot maintain a negligence claim against

4    defendant Woo "for discretionary decisions he made as the head of Placer County Sheriff's

5    Office." (Doc. No. 28-1 at 26.) Defendants appear to be invoking California Government Code

6    § 820.2, which states that "a public employee is not liable for an injury resulting from his act or

7    omission where the act or omission was the result of the exercise of the discretion vested in him,

8    whether or not such discretion be abused." Cal. Gov't Code § 820.2. However, defendants do

9    not elaborate on this argument in any way, and none of the three cases that defendants cite

10   seemingly in support of it discuss discretionary acts or refer to § 820.2 at all. (*See* Doc. No. 28-1

11   at 26) (citing *Arceo v. City of Roseville*, No. 2:20-cv-02334-DAD-DB, 2023 WL 5417210 (E.D.

12   Cal. Aug. 22, 2023); *Est. of Chivrell v. City of Arcata*, 694 F. Supp. 3d 1218 (N.D. Cal. 2023);

13   *Ochoa*, 2021 WL 7627630). In opposition, plaintiffs contend that defendants' argument in this

14   regard "is wrong as a matter of law" and is inappropriate for resolution at the pleading stage of

15   the litigation because it raises an affirmative defense. (Doc. No. 31 at 21–22.) Defendants do not

16   respond or address at all their "discretionary immunity" argument in their reply brief.

17          The undersigned has previously addressed a motion to dismiss state law claims under

18   California Government Code § 820.2 on immunity grounds. *See Aguaristi v. Cnty. of Merced*,

19   No. 1:18-cv-01053-DAD-EPG, 2019 WL 330908, at *9–10 (E.D. Cal. Jan. 25, 2019). As the

20   undersigned observed in *Aguaristi*, "it is the 'government defendants [who] have the burden of

21   establishing that they are entitled to immunity for an actual policy decision made by an employee

22   who consciously balance[ed] risks and advantages.'" *Id.*, at *9 (quoting *A.E.*, 666 F.3d at 639);

23   *see also Recchia v. City of L.A. Dep't of Animal Servs.*, 889 F.3d 553, 563 (9th Cir. 2018) ("[T]o

24   be entitled to immunity the state must make a showing that such a policy decision, consciously

---

25   [2]  The court notes that Rule 12(b)(6) is different in this regard from Rule 56, which expressly
26   permits a party to move for summary judgment in its favor as to a "part of [a] claim . . . on which
     summary judgment is sought." Fed. R. Civ. P. 56(a). "Of course, defendants' motion to dismiss
27   will be denied without prejudice to the filing of a motion for summary judgment at the
     appropriate time" as to plaintiffs' second theory. *Benyamin v. Topgolf Payroll Servs., LLC*, No.
28   2:23-cv-00303-DAD-SCR, 2025 WL 745827, at *4 n.4 (E.D. Cal. Mar. 6, 2025).

1  balancing risks and advantages, took place.").  Applying these holdings and considering the

2  allegations of plaintiffs' SAC, the court cannot conclude at this stage of the proceedings that

3  defendants are entitled to discretionary act immunity.  *See A.E.*, 666 F.3d at 640 ("It would be

4  odd indeed if a plaintiff included in a Complaint allegations that would establish a basis for

5  finding discretionary act immunity on the part of government defendants.").  Accordingly,

6  defendants' motion to dismiss plaintiffs' state law negligence claim pursuant to California

7  Government Code § 820.2 will be denied.

8  **E.     Wrongful Death Claim Against Defendant Woo**

9        Next, defendants move to dismiss plaintiffs' thirteenth claim for wrongful death brought

10  against defendant Woo.  (Doc. No. 28-1 at 27–28.)  In its prior order, the court found that

11  plaintiffs had alleged "in a conclusory fashion, that Wayne Woo caused Christopher Temple's

12  death by wrongful acts and neglect, including, among other actions, by maintaining policies or

13  customs of action and inaction which resulted in harm to Christopher Temple."  (Doc. No. 26 at

14  24.)  Accordingly, the court granted defendants' motion to dismiss the wrongful death claim as

15  asserted in plaintiffs' FAC against defendant Woo, with leave to amend.  (*Id.*)

16        Upon amendment, plaintiffs now allege that defendant Woo and the municipal defendants

17  caused the decedent's death "by wrongful acts and neglect" in three ways:

18
19        (a) Through their own conduct in creating or increasing an
           unreasonable risk of harm to [the decedent], including by
20         maintaining policies or customs of action and inaction resulting in
           harm to [the decedent].

21        (b) Through their special relationship (employer-employee) with [the
           defendant deputies], including by maintaining policies or customs of
22         action and inaction which resulted in harm to [the decedent].

23        (c) Through their special relationship with, and/or affirmative duty
           to protect, [the decedent], including by maintaining policies or
24         customs of action and inaction which resulted in harm to [the
           decedent].

25  (Doc. No. 27 at ¶ 204.)  Defendants move to dismiss this claim only as predicated on plaintiffs'

26  first basis, arguing that the allegations of plaintiffs' SAC at ¶ 204(a) are "conclusory."  (Doc. No.

27  28-1 at 28.)  As stated above, the court need not entertain defendants' challenge as to one of three

28  theories of liability under this claim in light of the other two unchallenged theories.

24

1    Finally, defendants argue that as to plaintiffs' wrongful death claim, defendant Woo "is

2    also entitled to § 802.2 immunity." (Doc. No. 28-1 at 28.) Defendants provide no authority in

3    support of this argument, and the court will reject it for the same reasons discussed above.

4    Accordingly, defendants' motion to dismiss plaintiffs' wrongful death claim as to

5    defendant Woo will be denied as well.

6                                       **CONCLUSION**

7    For the reasons explained above,

8    1.    Defendants' motion to dismiss (Doc. No. 28) is DENIED in its entirety;

9    2.    Defendants shall file an answer to plaintiffs' second amended complaint no later

10          than twenty-one (21) days after the date of entry of this order; and

11   3.    The court hereby withdraws its previous order referring the setting of an Initial

12         Scheduling Conference to the assigned magistrate judge (Doc. No. 11), and sets an

13         Initial Scheduling Conference for May 26, 2025 at 1:30 PM before the

14         undersigned. The parties shall file a joint scheduling report no later than fourteen

15         (14) days before this date.

16   IT IS SO ORDERED.

17   Dated:   **March 27, 2025**                    _Dale A. Drozd_

18                                                  DALE A. DROZD
                                                    UNITED STATES DISTRICT JUDGE
19

20

21

22

23

24

25

26

27

28